Brooks NICKLAS d/b/a Howard Sisson Company Insurance Agency, Inc., Respondent,

v.

LINCOLN LIBERTY LIFE INSURANCE COMPANY, Appellant.

No. KCD 26712.

Missouri Court of Appeals,
Kansas City District.

Dec. 30, 1974.

James H. Counts, Morton, Reed & Counts, St. Joseph, for appellant.

Errol D. Taylor, Utz, Litvak, Thackery, Utz & Taylor, St. Joseph, for respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

Plaintiff, defendant's former agent, sued for breach of his employment contract. Defendant counterclaimed for the value of certain office furniture and equipment furnished by it to plaintiff and as to which it claims plaintiff wrongfully refused it possession. The trial court heard the case without a jury and found for plaintiff on both the petition and the counterclaim. Defendant appeals with respect to each of those branches of the case.

In August, 1966, plaintiff became a soliciting agent for defendant under a Career Agent's Contract, which is a standard form setting forth the general rights and obligations of the parties, including a schedule of commissions. At the same time defendant granted to plaintiff, doing business as Trico Insurance Agency, Inc., a General Agent's Contract which contained provision for over-riding commissions in addition to those provided by the Career Agent's Contract. At that time, plaintiff was selling life insurance for another company and the purpose of the contracts with defendant was to permit him to sell health insurance policies for defendant.

After plaintiff had begun this association with defendant, defendant's superintendent of general agencies, Rufus R. Johnson, began negotiations with plaintiff in an effort to persuade him to establish a general agency for selling life insurance as well as health insurance for defendant in Missouri. A number of meetings took place including one in Houston, Texas, at defendant's home office.

Following the meeting in Houston, Johnson wrote to plaintiff on February 15, 1967, outlining the terms of an agency which had been proposed and discussed "[b]ecause every man needs to see in black and white the offer which is made to him under circumstances like these." These terms as set forth by Johnson included the payment of office expenses for plaintiff to set up offices in towns in Missouri, the payment of recruiting expenses, and the

payment of $750 a month for 12 months and $600 a month for the next six months "which will not be charged to you in any way."

Plaintiff was sufficiently interested in defendant's proposition that he began negotiations with Howard Sisson Company Insurance Agency, Inc., who had offices in St. Joseph, Missouri, and who were engaged primarily in the sale of fire and casualty insurance, to make some arrangements under which they could cooperate in handling an agency for defendant. Negotiations progressed to a point where a meeting was held in Kansas City, Missouri, in April, 1967, attended by Johnson, defendant's Vice President and Agency Director John F. Coffman, plaintiff, and Raymond A. Sisson.

Following the April meeting in Kansas City, plaintiff wrote a letter to Johnson, dated May 6, 1967, stating "[n]ow that we have verbally agreed on our working arrangements and so there will be no room for misunderstanding later, I am outlining below the arrangement as I understand it, and the basis on which I made my decision." Among the terms listed, it was specified that plaintiff was to receive $675 per month to establish and operate offices in Jefferson City and Columbia and he would also be allowed to set up other offices at defendant's expense as needed; plaintiff was to be paid $100.00 per month for recruiting expenses; plaintiff was to be paid $750 per month for 12 months and $600.00 per month for 6 months which will not be charged to him in any way; and plaintiff was to hire agents, field train and supervise them and attempt to get maximum production from them. Plaintiff also stated in this letter, "I will strive to build an agency that will be profitable, both to the company and to me."

Later the same month, defendant issued a General Agent's Contract which had the effect of cancelling the old agreement with plaintiff doing business as Trico Insurance Agency, Inc., and dealing with him instead under his new arrangements with the Sisson Agency. Defendant also issued an amendment to the Career Agent's Contract and General Agent's Contract having for its purpose to vest renewal commissions immediately. Both these agreements were to become effective June 1, 1967. At this time plaintiff also completed his arrangements with the Sisson Agency under which he acquired a 1/3 stock interest.

Plaintiff, together with the Sisson Agency, commenced the new operation in June 1967. Sisson, evicting a tenant in their St. Joseph premises, now used that space for expansion so as to accommodate the new operation as defendant's agency. New offices were opened in Jefferson City and in Columbia, for which defendant furnished the office furniture and equipment. Still another office was opened in Marysville, Missouri, in July, 1967, but that office was closed within a relatively short time.

Plaintiff continued to conduct this agency from June, 1967, through March, 1968. During that period the agency produced $803,946 in volume and $17,000 in annualized premiums, and plaintiff recruited ten agents for defendant, sending four of them to defendant's school in Houston. On January 22, 1968, Coffman wrote plaintiff complimenting him on the work he was doing and stating, "[o]ne of the nice things that happened in our Action '67 year was our association with you, and your contributions toward our achievements in '67 are most appreciated!"

Notwithstanding that complimentary letter in January, the very next month defendant advised plaintiff that because of his inadequate production, defendant would have to discontinue paying plaintiff management compensation and flat expense allowances. Plaintiff protested that decision, resulting in a discussion between him and Johnson in Jefferson City on February 28, 1968. However, on March 5, 1968, Johnson wrote to plaintiff stating the company's renewed determination "to cancel your subsidy and flat expense allowance" effec-

tive immediately. The reason given in this letter is that, "you have no full time men, and because you have not developed full time manpower as you had hoped you could, your issued premium is far short of what we discussed. * * * I feel you understand Lincoln Liberty's reluctance to continue financing your operation with expense money so far out of proportion to the amount of paid business received."

In response to that letter, plaintiff wrote a letter of protest to Johnson dated April 2, 1968, and, receiving no satisfaction, he proceeded to employ an attorney. His attorney wrote to Johnson on April 22, 1968, suggesting further discussion. However, defendant did not react favorably to plaintiff's employment of counsel, and by letter dated April 24, 1968, defendant announced termination of the General Agent's Supplement and the Agency Expense Allowance Supplement effective immediately and termination of plaintiff's Career Agent's Contract and any other supplement thereto effective May 10, 1968. This letter, signed by Johnson, concluded:

"Arrangements have been made for a moving and storage firm to pick up all furniture, office equipment, etc. belonging to Lincoln Liberty Life no later than May 10, 1968."

As a result of the action taken by defendant, plaintiff and the Sisson Agency reorganized the arrangement between themselves. Plaintiff began to sell general insurance as well as life insurance for the Sisson Agency, for which the Sisson Agency compensated him at the rate of $1,000.00 per month. The offices in Jefferson City and Columbia were closed, but rent obligation continued on the Columbia and Jefferson City premises for a number of months after defendant's termination of the agency. In connection with the closing of those offices, the furniture and equipment therein belonging to defendant were placed in storage.

The trial court found and concluded that plaintiff had performed his obligations but that defendant had breached its obligations under the agency contract, with resulting damages to plaintiff of $7,815.00, for which the court entered judgment. The counterclaim was dismissed pursuant to a finding that there was insufficient proof of any refusal by plaintiff to permit a removal by defendant of its property in the Jefferson City and Columbia offices.

Defendant raises the following points on appeal: (1) that the court erred in finding that no production standards were required of plaintiff under the Agency Contract; (2) that the court erred in finding that plaintiff had performed his obligations under the contract; (3) that the court erred in its determination of damages because it did not take into consideration plaintiff's earnings from the Sisson Agency after defendant's termination of the agency; and (4) that the trial court erred in dismissing the counterclaim.

I.

■■ With respect to its point concerning production standards, defendant contended in the trial court and its witnesses testified that all of defendant's agents, such as plaintiff, receiving fixed monthly payments, were subject to an understanding requiring them to "validate" those monthly payments. By this term, defendant means that each such agent was required to produce enough premium income so that the monthly payments to him would not exceed a specified percentage of the gross premium income produced by him. Defendant also contended, and its witnesses testified, that there had been an express verbal understanding between the parties by which plaintiff was obligated to obtain for the company ten full time agents to work under his supervision.

There was nothing to support these contentions in any of the printed agreements between the parties, nor in the exchange of letters between Johnson and plaintiff outlining the terms discussed and agreed upon between them. In view of that, the trial court

rejected the claims that there were specific production goals in the nature of "validation" or with respect to a requirement that plaintiff secure any specified number of full time agents under him. That determination by the trial court is amply supported by analysis of the documentary evidence in this case and, in fact, that conclusion by the trial court is not directly challenged by defendant.

However, defendant now shifts holds and tries to get to the same result by a slightly different variation on basically the same argument. It now casts its argument in terms that plaintiff was obligated to exercise reasonable efforts to establish a profitable agency. Defendant then proceeds to argue on the basis, without expressly so stating, that such reasonable efforts imports a requirement that plaintiff meet the standard of "validation" and the securing of ten full time soliciting agents.

Plaintiff does not quarrel with defendant's legal proposition that he was required to use his best efforts on behalf of defendant under the Agency Contract. But even recognizing that legal proposition, there is a vast gap between that and the recognition of specific production goals insisted upon by defendant and with which it is still trying to saddle the plaintiff. The trial court properly found that there were no such specific production standards during the break-in period of the first 18 months of plaintiff's agency for defendant. Defendant's effort to reintroduce these alleged requirements, in new guise, cannot succeed.

## II.

■ Under its second point defendant argues that plaintiff did not carry his burden of proving performance of his obligations under the agency contract and that in the absence of performance by plaintiff, defendant had a legal right to terminate. This whole argument is premised upon the unarticulated hidden premise that the contract called for specific production standards on the part of the plaintiff. As has already been discussed under Point I of this opinion, that assumption cannot stand scrutiny.

All that the contract required of plaintiff was that he make an honest good faith effort to promote defendant's business. Plaintiff's evidence in that regard showed, and the trial court found, that plaintiff opened three offices for the purpose of the agency, and for a time had a fourth office; he secured ten agents of whom four were sent to defendant's school at the home office; and plaintiff's performance was considered so satisfactory as late as January, 1968, that the company's vice president and agency director complimented plaintiff with the words that his association with the company was "[o]ne of the nice things that happened in our Action '67 year" and was "most appreciated." The trial court treated this evidence as showing compliance by plaintiff with his obligations under the contract, and that determination not being clearly erroneous will not be disturbed on this appeal. Rule 73.01(d), V.A.M.R.

## III.

With respect to the point concerning the amount of damage, defendant relies upon the rule of law that the measure of damages in a suit by an employee for breach of an employment contract is the contract price agreed less such sum or sums as the plaintiff earned or by the exercise of due diligence could have earned from the date of his discharge to the end of the contract period. Defendant points out that the trial court did not make any reference to this rule and made no findings or conclusions relative to this issue. Plaintiff does not challenge the rule of law upon which defendant relies, but responds that (a) this matter of mitigation of damages is an affirmative defense which was not pleaded and which is therefore not available to defendant; and (b) defendant failed to carry the burden of proving how much plaintiff earned or could have earned during the

balance of the contract period following termination.

## A.

■ Both parties during the course of trial delved extensively into the arrangements between plaintiff and the Sisson Agency after defendant's termination of its agency contract and the amounts and manner in which payments were made by Sisson Agency to plaintiff. At no time did plaintiff make any objection to this line of inquiry, and in fact his counsel participated fully in exploring the issue. This issue was therefore tried by the implied consent of the parties, and the pleadings will be deemed amended to include that issue. Rule 55.33(b). Kap-Pel Fabrics, Inc. v. R. B. Jones & Sons, Inc., 402 S.W.2d 49, 55 (Mo.App.1966).

## B.

■ Plaintiff's conception that defendant had the full burden of proof to show mitigation of damages is subject to considerable question. True, numerous cases hold that mitigation of damages in an employee's suit is an affirmative defense which must be pleaded and proved by the employer. See, for example, South Side Buick Auto Co. v. Schmitter, 5 S.W.2d 687 (Mo.App.1928); Burens v. Wolfe Wear-U-Well Corp., 236 Mo.App. 892, 158 S.W. 2d 175 (1942). On the other hand, it has also been held that once it is proved that the employee did secure other employment, then the burden is upon him to show the amount thereof so that his net damages can be computed. Hume v. Miller Hatcheries, Inc., 51 S.W.2d 179 (Mo.App.1932). It is unnecessary to further consider the cases on this subject, for even on the assumption that the full burden of proof rests upon defendant, the record here shows that defendant did successfully carry that burden.

Plaintiff freely admitted in his testimony that concurrently with the cutting off by defendant of its monthly expense payments to him, he entered into new financial arrangements with the Sisson Agency. These new arrangements called for plaintiff to sell a full line of insurance, including fire and casualty insurance, which he had not previously done. In consideration of this work, plaintiff was compensated by Sisson Agency in the amount of $1,000 per month. Plaintiff characterized this compensation as a "draw" which "had to be paid back through earned commissions." Raymond Sisson testified to the effect that plaintiff did so pay for his draws—in Sisson's words, plaintiff was "earning his keep."

The trial court's findings of fact and conclusions of law did not specify any itemization of damages. However, plaintiff in his brief, on the basis of the evidence, allocates $5,850 of the total judgment to compensation which he would have earned under his contract with defendant, of which three months would have been at $750.00 per month and 6 months at the rate of $600.00 per month. During this same nine month period, plaintiff actually received from the Sisson Agency $9,000, a sum considerably in excess of what he would have earned from defendant in salary had he not been terminated.

To avoid what would seem to be the obvious conclusion that plaintiff suffered no net loss of salary by reason of the termination, he claims in his brief that the $1,000 payments to him by the Sisson Agency "was taken into consideration at the time he sold his equity in the Sisson Agency back to the other principals involved." The trouble with this attempted justification is that it is not borne out by the evidence.

Plaintiff's own testimony on this point contrasts strikingly with the argument made by the quoted argument in his brief. In the course of his testimony the following questions and answers appear:

"Q   Now then, Mr. Nicklas, in some question to you by Mr. Counts with ref-

erence to the thousand dollar draw from Sisson Agency after termination of the Lincoln Liberty contract, in answer to those questions you stated that the draw was accounted for when you sold back your stock on whether you paid it back or not. Would you elaborate on that, when you in fact sold your stock back to Sisson and what matters were taken into consideration in the sale price for that stock?

"A The evaluation of the agency was determined by the assets in the agency at the time of the sale of the stock, and any monies drawn that would reduce the assets of the company would certainly reduce the value of the stock to be sold.

"Q Then actually you took the thousand dollar draw for that period of time? You didn't actually pay back a thousand dollars at any time, but it was taken into account when you sold stock back to the other two parties?

"A Right. It was drawn from the agency and would reduce the value."

The foregoing explanation does not negate the normal conclusion that the $1,000 a month compensation was actual earnings by plaintiff which were truly earned and never later diluted. Plaintiff's "explanation" seeks to leave the impression that the $1,000 per month payments to him were some sort of free will offering by the Sisson Agency out of its capital account. This is not at all what happened. During all this nine month period, plaintiff was selling insurance for the Sisson Agency. The premium income went into this agency. Instead of the $1,000 being paid to plaintiff out of capital, the payments were in effect made by the Sisson Agency out of the premium income being brought into the agency by plaintiff's sales. This can be the only meaning properly attributed to the testimony by Sisson that plaintiff was "earning his keep."

The only other testimony with respect to this matter of what adjustments may have been made in connection with plaintiff's sale of his stock came from Raymond Sisson. His testimony on this point was so vague, uncertain and confused that it adds nothing to the analysis, nor does it detract from the result of plaintiff's own testimony already quoted.

The net result of all the evidence on this point is that plaintiff actually earned from the Sisson Agency from April 1, to December 1, 1968, an amount in excess of what he would have received as salary from defendant during the same period. Plaintiff therefore suffered no damage on this item of his claim. According to plaintiff's own computation, as set forth in his brief, the amount attributed to this claim is $5,850. Under the authority of Rule 84.14, the judgment for plaintiff will be reduced by this sum.

### C.

The argument portion of defendant's brief complains as to the sufficiency of plaintiff's proof of the amount of his damage arising from the continuing lease obligations on the offices in Columbia and Jefferson City. These complaints are not properly before the court because they are not encompassed within the Points on Appeal. In any event, defendant's criticisms in this respect are not well founded.

### IV.

The issue for consideration with respect to the counterclaim is whether plaintiff ever refused the demand by defendant for possession of the furniture and equipment in the Jefferson City and Columbia offices. The letter from Johnson to plaintiff dated April 24, 1968, when Johnson stated that a truck would be sent to pick up this equipment no later than May 10, 1968, adequately proved a demand. The problem arises as to whether this demand was ever refused.

To show a refusal, defendant relies upon a stipulation of the parties during the

course of trial. At that time plaintiff's counsel stated:

"I will stipulate counsel wrote a letter after Rufus Johnson's letter of April 24th, making a demand for reconsideration and advising that we couldn't advise our client to surrender the furniture.

"THE COURT: Very well, does that satisfy you?

"MR. COUNTS: That is correct. Demand had been made and refused."

As stated by defendant's counsel in the voluntary comment last quoted, defendant predicates its entire claim of conversion on the theory that the letter from plaintiff's attorney constituted a refusal of Johnson's demand for return of possession. Johnson apparently treated the attorney's letter as such a refusal and it is apparently for that reason that no truck was ever sent to pick up the office equipment in question.

On the other hand, plaintiff's position is that he does not now and never has claimed any right to possession of the office equipment in question. He testified that he never refused possession to defendant and he knows of no such refusal. He states in his brief this equipment is in storage in Jefferson City, Missouri, has been in such storage since the spring of 1968 and is available to defendant now at any time. He explains the letter sent by his attorney as merely a statement of what advice was going to be given to plaintiff by his counsel.

A close question is presented on these facts. The trial court heard and considered all of the testimony and concluded that there was no refusal. That conclusion cannot be stigmatized as clearly erroneous and therefore must be accepted for purposes of this appeal. Rule 73.01(d).

The judgment for plaintiff is reduced to the sum of $1,965, and as so modified, is affirmed. The costs on this appeal will be divided equally between the parties.

All concur.