**John L. EMERICK, Plaintiff–Respondent,**

v.

**MUTUAL BENEFIT LIFE INSURANCE CO., Defendant–Appellant.**

No. 69420.

Supreme Court of Missouri, En Banc.

July 26, 1988.

Rehearing Denied Sept. 13, 1988.

John W. Cowden, Reggie C. Giffin, Petra T. Tasheff, Kansas City, for defendant-appellant.

Brent L. Brown, John M. Edgar, Craig S. O'Dear, Myron E. Sildon, Kansas City, for plaintiff-respondent.

WELLIVER, Judge.

Respondent, John Emerick, brought this action against appellant, Mutual Benefit Life Insurance Company, for fraud, breach of contract and conversion. Appellant counterclaimed for specific performance of an alleged settlement agreement. The trial jury found for respondent on the fraud, breach of contract and conversion claims and the trial court entered judgment totalling $2,254,117 actual and $6,000,000 in punitive damages. The trial court also entered judgment against appellant on its counterclaim. Appellant appeals both judgments. Respondent appeals the granting of summary judgment for appellant on three other counts of violation of franchise statutes, breach of oral contract and breach of fiduciary duty.

The Court of Appeals, Western District, affirmed the trial court on the fraud count and reversed the conversion count. The summary judgment in favor of appellant on the original counts of violation of franchise statutes, breach of oral contract, and breach of fiduciary duty was affirmed. We transferred this case and decide it as on original appeal. Mo. Const. art. V, § 10. We affirm the summary judgment for appellant on respondent's cross appeals for violation of franchise statutes, breach of oral contract and breach of fiduciary duty. We affirm the trial court's judgment for respondent on appellant's counterclaim for specific performance of the settlement agreement. We reverse the judgments for fraud, conversion and breach of contract.

We remand with directions to assess certain damages and costs consistent with this opinion.

I

THE FACTS

Appellant is a mutual life insurance company with its principal office in Newark, New Jersey. Appellant contracts with general agents to distribute its products. General agents, in turn, contract with selling agents who sell the products.

Respondent was a general agent for appellant from 1974 to 1977 in Phoenix, Arizona. In 1977 respondent was offered a position as regional supervisor of agencies and moved into appellant's Western Home Office in Kansas City.

Two years later in July 1979, Mr. Mascotte met with respondent and offered him the general agency in Kansas City. Respondent voiced some concern about the financial aspect of the agency but Mr. Mascotte assured him that the company would work with him.

Respondent signed the General Agency Agreement on August 1, 1979, and took over the Kansas City agency. He reported directly to Mr. Mascotte, because his old position, Vice–President of Agencies, had not yet been filled. In February 1980, Angelo Schiralli was appointed to the Western Home Office as Vice–President of Agencies. Respondent thereafter was to report to Mr. Schiralli rather than Mr. Mascotte.

Mr. Schiralli was concerned about the high expense level of the Kansas City Agency. He expected respondent to submit expenditures to him in advance as called for in the budget agreement. The budget agreement signed by respondent required respondent to consult in advance with Mr. Schiralli before committing himself to any expenditures in excess of $200. Respondent did not get prior approval in accordance with the agreement.

Mr. Schiralli refused to reimburse respondent for these items that had not been approved in advance. Respondent claimed Mr. Mascotte told him before he agreed to take the agency that he did not have to comply with this condition. Mr. Schiralli insisted on compliance and told respondent: "John, I don't want to bust your ass, but please cooperate on these disallows."

Respondent asked Mr. Schiralli to contact Mr. Mascotte. After talking with him, Mr. Schiralli did allow some previously rejected items and reimbursed respondent for these and for contest prizes he had given to his selling agents. He also reimbursed him for items that he had purchased in 1979. However, from that point on, Mr. Schiralli insisted on compliance with the agreement.

Another problem developed when respondent was asked to move his agency from the Western Home Office. The Kansas City agency occupied office space in the Western Home Office building. The Home Office was expanding and needed the space occupied by the agency. Respondent searched for suitable office space. He looked in several different locations and considered not only the price of various offices but also the location. Several of his selling agents had asked to remain in the same area as the Home Office. Eventually respondent was able to negotiate a lease in a new building across the street from the Home Office. His selling agents were particularly pleased with his choice.

When respondent first discussed the lease in February with Mr. Mascotte and Mr. Schiralli, they both agreed it was a very good deal. However, Mr. Schiralli changed his mind after discussing other locations in Kansas City with a friend. He investigated some of these sites and came to the conclusion that the lease signed by respondent was too expensive.

Mr. Schiralli met with Mr. Mascotte and they both agreed respondent's expense level was too high. Mr. Mascotte told Mr. Scharilli to get some firm figures on a prospective lease and discuss it with respondent. Mr. Schiralli compared these figures with those on respondent's lease and found that there was about a $50,000 difference over a two-year period. He looked only at the first two years because the company would only be subsidizing the rent paid by respondent for the first two years respondent had the new agency.

In May 1980, Mr. Schiralli and Mr. Mascotte met with respondent to discuss the lease. They both concluded that it would be unfair to absorb the $50,000 additional expense of respondent's lease. They decided that if respondent were to choose to stay with his lease, he would have to bear the $50,000 that was considered excess cost. According to Mr. Mascotte, he was setting the maximum amount of subsidy that the company would pay on rent. The choice was respondent's: he could either go through with his lease and pay the excess $50,000 personally or go with a less expensive lease and appellant would try to get him out of his lease.

Respondent explained why he did not believe the location proposed by Mr. Schiralli was a good one for the agency. First, respondent had already signed the lease in April and he did not know if he could get out of it. Second, his agents did not want to move downtown, which was the location of the office chosen by Schiralli. Third, respondent had tried to negotiate for an office in that building, and there had been

no suitable space available. Respondent asked Mr. Mascotte to reconsider, and Mr. Mascotte said that he would. When respondent heard nothing from Mr. Mascotte the rest of the summer, he considered the issue closed.

In the fall respondent negotiated with Tom Bash, the former general agent, for the going concern value of the agency at the time respondent took over. Mr. Bash originally asked for $115,000 but then agreed to accept a lump sum payment of $25,000. Respondent asked Mr. Schiralli for this amount in the form of a special development allowance loan. (SDA) (This loan was made to a general agent as an advance against future earnings.) Mr. Schiralli told respondent he was reluctant to do so since he was already down for $50,000 of SDA for the lease. Respondent was surprised that Mr. Schiralli and Mr. Mascotte intended to collect the $50,000. Mr. Schiralli worked out a plan whereby respondent could make up the $50,000 over the next three years. The plan involved giving respondent less subsidy so that repayment of the loan would not take money out of his future earnings. Respondent refused to discuss it, believing that Mr. Schiralli was wrong in "penalizing" him.

Eventually Mr. Schiralli did issue respondent the $25,000 SDA but respondent did not give this money to Mr. Bash. Instead in April 1981 he wrote to Mr. Bash, explaining the problem he was having with appellant and the lease. He felt he could not release the $25,000 until the lease issue was resolved.

Respondent then contacted an attorney, Myron Sildon. On April 14, 1981, Mr. Sildon wrote Mr. Schiralli explaining why he believed Mr. Schiralli was mistaken in insisting respondent pay the $50,000. Mr. Schiralli, upon receipt of this letter, contacted Mr. Johnson, Senior Vice-President-Agencies, who agreed with Mr. Schiralli that respondent should be asked to resign or be terminated if he refused. Mr. Schiralli met with respondent and Mr. Sildon and informed respondent of the company's decision.

Respondent was given several reasons for this action, including high expenses, low production, and an inability to work with the home office. Respondent at first refused to resign and then asked for two weeks to consider it. During this time extensive negotiations took place between appellant and respondent. Appellant agreed to pay off respondent's debt in exchange for his resignation. Finally respondent resigned on May 29, 1981, but he did so under protest. Appellant's counsel drafted the alleged agreement made between respondent and appellant. However, there were several clauses contained in this written document which respondent claimed had not been part of the negotiations. Respondent refused to sign the agreement and appellant refused to pay any of the debt until respondent signed.

After respondent resigned but before the settlement agreement could be finalized, appellant took over the agency. Appellant assumed the lease and used the furniture and office equipment. No demand was ever made that either the lease or the furniture be retransferred. Respondent then brought this action against appellant for fraud, breach of contract, and conversion and violation of franchise statutes, breach of oral contract, and breach of fiduciary duty.

Before any of these matters are taken up, there is a preliminary matter to be considered.

## II

### SETTLEMENT AGREEMENT

Appellant appeals the judgment against it on its counterclaim for specific performance of the alleged settlement agreement and seeks to enforce the agreement and limit respondent's recovery to its term. Respondent argues no settlement agreement exists and alternatively, that the agreement was repudiated by appellant. The trial court found no agreement had been reached, or if reached, appellant later repudiated it.

The evidence on the settlement is as follows: Appellant requested respondent's

resignation on May 12, 1981, and it was understood that respondent would be terminated if he did not resign. Respondent refused to resign, and on May 26, 1981, appellant delivered a 60–day termination notice to respondent. On May 28–29, 1981, appellant and respondent met to try and negotiate a settlement agreement to secure respondent's resignation. At no time during the May 28–29 negotiations did the parties discuss releasing appellant from future claims. Following the meeting respondent resigned and appellant took over the agency.

Appellant later forwarded a written document representing the alleged settlement agreement. Among other items, it included a paragraph stating that the intent of the agreement was to resolve all of respondent's claims and controversies against appellant. Respondent refused to sign the agreement.

The trial court's judgment must be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Specific performance will be denied if it is doubtful whether there has ever been a meeting of minds or a full and complete understanding on all the essential terms of the contract sought to be enforced. *Ragan v. Schreffler*, 306 S.W.2d 494, 499 (Mo.1957).

Settlement agreements are contracts and subject to contract law. *DeWitt v. Lutes*, 581 S.W.2d 941, 945 (Mo.App.1979). An enforceable contract requires a meeting of the minds on the subject matter of the contract. *Revere Copper & Brass Inc. v. Manufacturers' Metals & Chemicals Inc.*, 662 S.W.2d 866, 869 (Mo.App.1983); *Elliott v. Johnston*, 673 S.W.2d 807, 809 (Mo.App. 1984); *Rosenblum v. Spitzer*, 648 S.W.2d 926, 927 (Mo.App.1983). Unless both parties manifest assent to the contract terms, no contract is formed. It follows that equity will not create a contract for the parties if they themselves have not agreed. *Bohlken v. Monsees*, 655 S.W.2d 604, 607 (Mo.App.1983).

There was no manifestation of mutual assent by the parties to the terms of the contract on May 29. Neither appellant nor respondent discussed a release. Appellant claims the never-discussed release was implicit in the negotiations. Contracts, however, are formed according to outward manifestations and not unexpressed intentions. The record supports the findings of the trial court and the judgment of the trial court is affirmed in this respect.

## III

## FRAUD

■ As to the fraud claim, appellant contends that as a matter of law, respondent failed to make a submissible jury issue and that the court should have directed a verdict in its favor. When the trial court errs in failing to direct a verdict, the appellate court must determine whether or not the respondent presented substantial evidence at trial supporting his theory of recovery. *Strebler v. Rixman*, 616 S.W.2d 876, 877 (Mo.App.1981). We must review the evidence in the light most favorable to the respondent, giving him the benefit of all reasonable inferences, and disregarding the appellant's evidence except as it aids the respondent's case. *Id.*

Respondent claims he was induced to become appellant's general agent in Kansas City by Jake Mascotte, who allegedly made fraudulent misrepresentations to him during a meeting in July 1979. Mr. Mascotte was appellant's Executive Vice President and chief operating officer for the western half of the United States. Mr. Mascotte had complete authority in the western half of the United States to hire general agents, to terminate general agents, and to budget the general agents. During this meeting, Mr. Mascotte offered respondent the general agency in Kansas City. Respondent expressed reluctance because he was aware of the turnover of selling agents experienced by Tom Bash, the former general agent.

According to respondent and as stated in the verdict director at trial, Mr. Mascotte made the following representations. First,

appellant would provide respondent with sufficient financial support over a sufficient time period to build a showcase agency in Kansas City. Second, appellant would regard respondent as the expert in running the affairs of his agency. Third, respondent had been selected for the general agent appointment with the confidence and support of the Chairman of the Board, Robert Van Fossan.

The following elements are necessary to establish fraud:

(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, or his ignorance of its truth, (5) the speaker's intention that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) his right to rely thereon, and (9) the hearer's consequence and proximately caused injury.

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988); *Sofka v. Thal*, 662 S.W.2d 502, 506 (Mo. banc 1983); *Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483, 488 (Mo. banc 1966).

A failure to establish any one of the essential elements of fraud is fatal to recovery. *Heberer v. Shell Oil Co.*, 744 S.W. 2d 441, 443 (Mo. banc 1988).

Appellant claims these representations were not false. The falsity of the representation must be determined as of the time it was made and as of the time it was intended to be and was relied on. *Powers v. Shore*, 248 S.W.2d 1, 6 (Mo. banc 1952); *Kiechle v. Drago*, 694 S.W.2d 292, 294 (Mo. App.1985).

Appellant claims these statements were merely promises made by Mr. Mascotte. Fraud may not be based on a "mere promise." *Reed v. Cooke*, 331 Mo. 507, 55 S.W. 2d 275 (banc 1932). More recently in *Sofka v. Thal*, 662 S.W.2d 502 (Mo. banc 1983) this Court found that:

[w]hile the mere giving of a promise, though breached the following day, would not give rise to an action for tortious fraud, *McGuire v. Bode*, 607 S.W.

2d 165, 167 (Mo.App.1980), *a promise accompanied by a present intent not to perform is a misrepresentation of present state of mind, itself an existing fact, sufficient to constitute actionable fraud. White v. Mulvania*, 575 S.W.2d 184, 188 (Mo. banc 1979). See also Restatement (Second) of Torts § 530.

*Id.* at 506.

A misrepresentation of present state of mind is defined in *Dillard v. Earnhart*, 457 S.W.2d 666 (Mo.1970), which quotes Comments a and c to § 530, 3 Restatement of Torts, p. 69:

A false representation of intention is actionable if the statement is reasonably interpretable as expressing a firm intention and not merely as one of those "puffing" statements which are so frequent in negotiations for a commercial transaction as to make it unjustifiable for the recipient to rely upon them. * * * On the other hand, one who acts in justifiable reliance upon another's honest statement of his then existing intention cannot maintain an action for the loss caused by the disappointment of his expectations if the other for any reason, good or bad, changes his mind and fails or refuses to carry his expressed intention into effect. If the recipient wishes to obtain legal assurance that the intention honestly entertained will be carried out, he must see that it is expressed in the form of an enforceable contract.

*c. Proof of intention not to perform agreement.* The intention which is necessary to make the rule stated in this Section applicable is the intention of the promisor when the agreement was entered into. The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. Such intention may be shown by any other evidence which sufficiently indicates its existance as, for example, the certainty that he

would not be in funds to carry out his promise.

*Id.* at 670–71.

Respondent presented no evidence at trial that appellant did not intend to give him sufficient financial support over a sufficient time period or that respondent would not be regarded as the expert at the time Mr. Mascotte made these representations in July. The record shows that from August 1 through December 1979, respondent had an open checkbook and in 1980 appellant subsidized the agency in the amount of $204,274. There was no evidence that the subsidies were insufficient or appellant failed to subsidize the agency in accordance with Mr. Mascotte's and respondent's understanding in July 1979.

Respondent was allowed to run his agency independently under Mr. Mascotte. Mr. Schiralli, when he took over, became concerned about what he felt were respondent's high expenses and lower than projected production. He felt it was in appellant's best interest to exercise more control over respondent. The intent to allow respondent to be the "expert" cannot be established by the fact that appellant began to exercise more control over respondent than was first anticipated. There must be an inconsistent intent to perform at the time the representation was made. *Grosser v. Kandel–Iken Builders,* 647 S.W.2d 911, 914 (Mo.App.1983).

The most that respondent has shown by the evidence is that appellant changed its mind in the way it would deal with respondent after Mr. Schiralli came into the Home Office. Respondent has presented no evidence that at the time Mr. Mascotte made these representations he did not intend to perform them. *See Craft v. Metromedia,* 766 F.2d 1205 (8th Cir.1985) (plaintiff's evidence did no more than suggest that the station changed its mind as to steps that would be necessary regarding her appearance as co-anchor).

Respondent claims the representations made by Mr. Mascotte regarding respondent as the expert in managing the agency is contrary to appellant's company policy. He cites the Van Fossan deposition testimony where he stated if a general agent is receiving subsidy for his agency the company retains the right to direct all phases of the agency's operation. He also cites the Johnson deposition testimony when Mr. Johnson says if "a general agent receives subsidy from the company, the company will have input on how he spends it." We do not believe that this constitutes proof that Mr. Mascotte did not intend to treat respondent as an expert.

Respondent claims it is irrelevant whether Mr. Mascotte knew his statements were false because he was appellant's agent. He argues that "[a] recovery can be had for false representations made to another with the intent that they be communicated to a third person for the purpose of defrauding said third person." *Wilson v. Murch,* 354 S.W.2d 332, 337 (Mo.App.1962).

In *Essex v. Getty Oil,* 661 S.W.2d 544 (Mo.App.1983), the contract at issue had a termination clause, but defendant's agent represented to plaintiff at the time it was signed that it would be invoked only for good cause. There was evidence the company had expressly directed a misstatement.

In the record there is no evidence appellant directed Mr. Mascotte to make these statements nor does respondent identify any superior who expressly directed Mr. Mascotte to make such statements. Respondent has failed to show any evidence that appellant did not intend for him to be the expert in running the agency.

The third alleged representation was that respondent had been selected for this appointment with the confidence and support of Robert Van Fossan, the Chairman of the Board. Mr. Van Fossan, through his deposition testimony, stated he never believed in respondent nor in his ability to be a general agent.

Assuming that this representation was false, respondent still must show that this statement was the direct and proximate cause of his losses.

In order for a false representation to be actionable, there must exist a causal connection between the misrepresenta-

tion and the harm allegedly sustained. *Collins v. Adams Dairy Co.*, 661 S.W.2d 603, 605 (Mo.App.1983). "It must appear in an appreciable sense that the damage flowed from the fraud as the proximate and not the remote cause, and the damage must be such as is the natural and probable consequence of the fraud." 37 Am.Jur.2d Fraud and Deceit, section 293, as quoted in *Collins*, 661 S.W.2d at 605. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443–44 (Mo. banc 1988). "The damages recoverable represent the pecuniary loss to the recipient of the misrepresentation of which the false statement is a 'legal cause,' i.e., the loss reasonably expected to stem from reliance upon the representation. Restatement (Second) of Torts §§ 548A, 549." *Collins v. Adams Dairy Co.*, 661 S.W.2d 603, 605 (Mo.App.1983).

Respondent testified he would not have accepted the general agency if he had known Mr. Van Fossan had no confidence in him.

There is no evidence in the record that Mr. Mascotte was aware of Mr. Van Fossan's personal opinion of respondent. Mr. Van Fossan testified that he did not remember telling anyone what he personally thought about respondent. There was no evidence that Mr. Van Fossan told Mr. Mascotte he didn't think respondent was the right person for the job.

Respondent has failed to show how the lack of Mr. Van Fossan's support and confidence caused him to suffer any damages. The cause, if any, of respondent's alleged damages was his termination. We have searched the record and cannot find one line of testimony that Mr. Van Fossan had anything to do with respondent's discharge. Mr. Van Fossan testified he was unaware respondent had been terminated until one of respondent's selling agents called Mr. Van Fossan and asked that respondent's termination be reconsidered.

Respondent has failed to show that damages were the natural and probable consequence of his reliance upon Mr. Van Fossan's support and confidence. The trial court erred in submitting the misrepresentation to the jury because respondent has

failed to establish the element of proximate cause.

In argument, respondent suggests he built up a good agency in Phoenix and appellant tricked him into leaving it to come to the home office. We find no evidence of such trickery.

In argument, appellant suggests that there was a pattern of trickery going back to his move from Phoenix to Kansas City in 1977. The only evidence offered was that the company had someone in mind to fill the Phoenix position after he left. There would appear to be no reason or cause for trickery with reference to the Phoenix contract of employment because it too was an at will contract of employment. There is no evidence connecting the Phoenix employment contract with this contract entered into two years later in Kansas City. Respondent has failed to make a submissible case of fraud. We reverse the trial court as to the fraud judgment.

IV

BREACH OF CONTRACT

■ Appellant appeals the trial court's denial of its motion for directed verdict or motion for judgment notwithstanding the verdict on respondent's claim for breach of contract. Appellant asserts that there was no evidence to support respondent's breach of contract claim because the Agreement for General Agents is unambiguous in permitting appellant to terminate respondent without cause.

The Agreement for General Agents, entered into by appellant and respondent, effective August 1, 1979, included the following provision for termination:

**XIII. Termination.** The following provisions shall apply with respect to termination of this Agreement.

**(a) Basis of Termination.** This Agreement may be terminated at any time by either party, by giving the other sixty days' notice to that effect; or it may be terminated immediately by the Company if in its judgment its interests so require....

Appellant claims that the termination clause provided for termination of a general agent without cause, and the trial court erred in admitting parol evidence that indicated otherwise. Respondent contends that he could only be terminated for cause.

In reviewing a motion for directed verdict made by appellant, defendant below, the evidence must be considered in the light most favorable to respondent, plaintiff below. We must accept as true that which is not entirely unreasonable or opposed to physical laws, accord to the plaintiff the benefit of all favorable inferences from the evidence, and reject all unfavorable inferences, disregarding defendant's evidence insofar as it does not aid plaintiff's case. *Vandever v. Junior College Dist. of Kansas City,* 708 S.W.2d 711, 716 (Mo.App. 1986). A defendant is entitled to a directed verdict if reasonable minds, in viewing the evidence in the light most favorable to the plaintiff, only could have found in defendant's favor. *Id.* at 716.

The parol evidence rule is as follows: In the absence of fraud, duress, mistake or mental incapacity, an integrated unambiguous written contract may not be varied, altered or contradicted by parol or extrinsic evidence, and all prior or contemporaneous agreements are conclusively presumed to have been merged into the written contract, which itself becomes and is the single and final memorial of the understanding and intention of the parties.

*Campbell v. Dixon,* 647 S.W.2d 617, 620 (Mo.App.1983). Whether an ambiguity exists, is a question of law. *Commerce Trust Co. v. Howard,* 429 S.W.2d 702, 705–06 (Mo.1968); *Vandever,* 708 S.W.2d at 717. A contract is ambiguous when it is reasonably susceptible of different constructions. *J.E. Hathman, Inc., v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973).

The termination clause of the General Agent's Agreement clearly states that either party can terminate the agreement upon 60 days' notice, or, the agreement "may be terminated by the company immediately if in its judgment its interests so require." The language is not reasonably susceptible of two different meanings and therefore not ambiguous. Respondent could be terminated "at will." Appellant had no obligation to supply reasons. *Cf. Dake v. Tuell,* 687 S.W.2d 191 (Mo. banc 1985). The trial court erred in concluding that the contract was ambiguous. Any evidence indicating that appellant could only be terminated for cause was improperly admitted.

Assuming that appellant was required to give 60 days' notice, the undisputed evidence of the record was that 60 days' notice was given in the letter dated May 26, 1981, effective July 25, 1981. Appellant did not breach the termination clause of the contract.

We reverse the trial court as to construction of the termination clause of the employment contract. Certain permissible damages under the contract will be discussed later.

V

CONVERSION

On this point we borrow liberally from the opinion of Lowenstein, J., of the Court of Appeals without use of quotation marks.

Appellant appeals the jury verdict that it converted seven items of property belonging to respondent.

The following verdict director was submitted to the jury:

**INSTRUCTION NO. 15**

Your verdict must be for plaintiff John Emerick on his claim for conversion, if you believe:

First, that prior to May 29, 1981 Mr. Emerick was the owner of the assets of the Emerick Agency, *including* the *agency furniture, office equipment, leasehold improvements, lease for office space, agent debit balances, renewal commission* and *athletic tickets,* and

Second, that Mutual Benefit appropriated to its use and possession the assets of the Emerick Agency, and

Third, that Mutual Benefit's taking of the assets of the Emerick Agency was unauthorized and wrongful and

Fourth, Mr. Emerick was thereby damaged.

(Emphasis added.)

An examination will be made of the items submitted under this count to evaluate which were subject to an action of conversion. The evidence will be considered in the light most favorable to respondent, giving him the benefit of all reasonable inferences and disregarding appellant's evidence except as it may support the verdict. *Brown v. Meyer,* 580 S.W.2d 533, 534 (Mo. App.1979).

## A

### THE LEASE

■ Appellant claims it did not convert the lease to respondent's office because (1) the lease is not the type of property properly subject to an action for conversion; and (2) appellant was authorized to assume the lease. Respondent's theory was that the lease value had increased and developed a "bonus value" between the time he first negotiated the lease and the time of his termination. When he was terminated, the lease had nine years to run at a rental of $9.75 per square foot. Appellant paid the rent but respondent claimed the increased market value over the cost of the lease was property converted by appellant.

Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. *Maples v. United Savings and Loan Association,* 686 S.W.2d 525, 527 (Mo.App.1985). A lease is "regarded as a conveyance or grant of an estate in real property ..." *State ex rel. St. Louis County v. Evans,* 346 Mo. 209, 139 S.W.2d 967, 969 (Mo. banc 1940). A lease "creates an estate in the land." *State ex rel. State Highway Commission of Missouri v. St. Charles County Associates,* 698 S.W.2d 34, 36 (Mo.App.1985). Leases are not subjects of conversion. 89 C.J.S. *Trover and Conversion,* § 22, p. 541, *see also Vuich v. Smith,* 140 Cal.App.

453, 35 P.2d 365, 366 (1934) (a leasehold interest is not the subject of an action for trover or conversion).

Respondent relies upon *Orchard v. Wright–Dalton–Bell–Anchor Co.,* 225 Mo. 414, 125 S.W. 486 (1909), which found that a leasehold may be considered personal property. This case involved a dispute over a widow's dowry rights. It did not involve a claim of conversion and cannot control the result of this case.

The lease itself provided for an assignment of respondent's rights to appellant. The assignment was to become effective at appellant's option at the termination for any reason of respondent's general agency agreement.

Appellant's assumption of the lease was authorized. There can be no recovery for conversion where there is no unauthorized conduct. *Graves v. Stewart,* 642 S.W.2d 649, 650–51 (Mo. banc 1982).

Conversion of the lease was improperly submitted to the jury.

## B

### THE AGENT DEBIT BALANCES

■ Appellant next contests the jury's findings that it converted the agent debit balance of $62,462. Appellant argues the debit balances were not susceptible to a conversion action because they were mere debts.

Conversion does not generally lie for money represented by a debt. *Dillard v. Payne,* 615 S.W.2d 53, 55 (Mo.1981). Conversion may lie, however, as to funds placed in the custody of another for a specific purpose and their diversion for such other than such specified purpose. *Dillard* at 55.

Respondent's debit balances represented money loaned by respondent to his agents to cover various expenses. There is no evidence here that appellant directed the money towards a purpose different from which it was originally directed.

Respondent argues that the debit balances could be converted because they were merged into a tangible document. He claims that the debit balances were "notes" constituting tangible physical evidence of

the intangible debt. There is no evidence in the record of any tangible "notes" nor is there any evidence appellant converted tangible "notes" to its own use. This item was improperly submitted.

## C

### THE LEASEHOLD IMPROVEMENTS

■ Appellant claims the leasehold improvements were not covered because the improvements were the property of the landlord under the lease.

The leasehold improvements were carpeting, walls, wallpaper, drapes and cabinets installed in respondent's office. Respondent borrowed the money to pay for these items from the United Missouri Bank. Under paragraph seven of respondent's lease with One Pershing Square, the following language appears:

Tenant may not make or allow to make any alterations, additions or improvements to or of the Premises or any part thereof without the written consent of the landlord. Any alterations, additions or improvements to or of said premises, including, without limitation, any non-movable partitions, and all carpeting or other floor covering, shall become part of the realty and belong to landlord upon their installation. Movable fixtures shall remain the property of the tenant.

Respondent testified the leasehold improvements were "attached to the space" and "physically not movable." As non-movable additions to the leasehold, the improvements became the property of the landlord under the express provisions of respondent's lease. Respondent may not assert a claim of conversion for property he does not own. *Hampton v. Stephens*, 691 S.W. 2d 287, 289 (Mo.App.1985). The jury should not have considered damages for conversion of the improvements.

## D

### THE FURNITURE AND OFFICE EQUIPMENT

■ Appellant next contests the jury's finding that it converted respondent's office furniture and equipment. Respondent had borrowed money to furnish the office which totalled $174,030 at the time of trial.

Appellant was to purchase respondent's furniture, equipment and other agency assets under the proposed settlement plan discussed during the May 29 negotiations. Pursuant to those negotiations, and in anticipation of a settlement agreement, appellant, on June 1, assumed possession of the agency with respondent's knowledge. On June 2, appellant sent respondent the final written settlement agreement. Respondent would not sign the agreement because it contained the release provision. Appellant would not delete the provision and negotiations between the parties broke off.

On June 26, William Curtis, for appellant, wrote the following to respondent's attorney Mr. Sildon:

Mutual Benefit has assumed the lease at One Pershing Square, but there is furniture and equipment on the premises which belong to Mr. Emerick. We would appreciate his suggestions concerning the disposition of this property. We will state that if Mr. Emerick wishes to remove the said furniture and equipment from the premises, Mutual Benefit will be willing to accommodate him and cooperate with him. On the other hand, if he prefers to leave the property in place pending future negotiations with the new General Agent, that will be agreeable. However, if he prefers instead to negotiate immediately with Mutual Benefit for a sale, an attempt will be made to arrive at a mutually agreeable price.

Respondent did not respond to appellant's request for instructions. Appellant wrote respondent again on September 11, 1981:

What we are now asking is simply for Mr. Emerick to confirm to Mutual Benefit which furniture and equipment, if any, belongs to the agents. With respect to the remainder of the furniture and equipment, Mutual Benefit continues to stand ready, willing and able to deliver that furniture in accordance with Mr. Emerick's instructions. Mutual Benefit does not desire to retain Mr. Emerick's furniture and equipment on its leased premises.

Respondent did not respond to the correspondence, did not demand appellant give

up the items and did not attempt to retrieve the furniture and equipment. Respondent now claims the property was converted.

Conversion may be proved three ways. Respondent can show either (1) a tortious taking, (2) a use or appropriation by appellant indicating a claim of right in opposition to the owner, or (3) a refusal to give up possession on demand. *Houston v. Columbia Fed. Sav. & Loan Ass'n.*, 569 S.W. 2d 211, 214 (Mo.App.1978); *Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 521 (Mo.App.1986). The third method is appropriate when the defendant rightfully assumes possession of the property but wrongfully retains possession. *Glass v. Allied Van Lines, Inc.*, 450 S.W.2d 217 (Mo.App.1970); *Nicklas v. Lincoln Liberty Life Ins. Co.*, 518 S.W.2d 106, 112–13 (Mo. App.1974). "Where there has been no wrongful taking or disposal of the goods and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort." Prosser and Keeton on Torts, § 15, p. 99 (5th ed. 1984). Respondent cannot expect to prevail on a claim of conversion when his own conduct fostered the dispossession. Appellant did not convert respondent's furniture and equipment. There was no "tortious taking" because appellant's initial possession of the property was authorized. *Hardesty v. Mr. Cribbin's Old House, Inc.*, 679 S.W.2d 343, 347 (Mo.App.1984).

The second method of proving conversion is also unavailable to respondent because there was no use or appropriation in opposition to respondent's rights. Appellant's letters to respondent vitiate respondent's claim that appellant acted in a way to deprive respondent of ownership. The third method of proving conversion, appropriate when the initial possession is authorized, is also inapplicable in this case because respondent never demanded that appellant give up the property. In fact, appellant never indicated any unwillingness to surrender possession. The letters show appellant did all it could to accommodate respondent with regard to the furniture and equipment. The furniture should not have been treated as converted.

E

## ATHLETIC TICKETS

■ Respondent contends appellant converted athletic tickets valued at $1,058 which had been purchased by respondent.

At oral argument respondent claimed that appellant's executives or officers "went to the ball games." We have searched the record and find no evidence that these tickets were used by anyone who worked for appellant nor that respondent demanded their return. The trial court committed error in submitting this item to the jury on the theory of conversion.

F

## THE RENEWAL COMMISSIONS

The next matter concerns the renewal commissions. Respondent's renewal commissions are his stake in the insurance policies sold through the agency during his tenure as general agent. For each policy sold, respondent received a percentage of the policy premium. Respondent received 7% of the premium on the policy through the second year and 2% of the premium for policies renewed during years three through ten. A single policy could be a source of agent income for up to ten years.

At trial respondent submitted two types of renewals, both the renewals due at termination, valued at $128,520 and the renewals due after respondent reached age 65 valued at a present value of $87,121.

■ Respondent's claim on policies he might have sold if he had continued as the general agent is improper because it is based on speculation. An action for conversion must be based on more than mere speculation, guesswork or conjecture. *Brown v. Meyer*, 580 S.W.2d 533, 536 (Mo. App.1979). This item should not have been submitted to the jury on the theory of conversion.

■ The value of the renewal commissions due at respondent's termination was also incorrectly submitted to the jury. The General Agent's Agreement calls for the company to pay to the General Agent commissions on premiums received by the company, but not before the due date of any

such premiums. Respondent was entitled to these renewal commissions but his right to possession was not realized until the due date.

Respondent has failed to show he had an immediate right to possession of the renewal commissions at the time of the alleged conversion. A plaintiff charging conversion must show possession or the right to possession, or an ownership which carries with it the right to immediate possession. *Osborn v. Chandeysson Electric Co.*, 248 S.W.2d 657, 663 (Mo.1952); *Brown v. Meyer*, 580 S.W.2d 533, 534 (Mo.App.1979).

Respondent's right to possess these commissions did not accrue until the time that each policy's premium was due. The commissions should not have been treated as converted.

From the preceding analysis we reach the conclusion that the conversion count was improperly submitted to the jury. We reverse the finding of conversion entered by the trial court.

## VI

### CROSS APPEALS

Cross-appellant Emerick claims the trial court erred in sustaining cross-respondent Mutual Benefit's Motion for Summary Judgment on Count I of cross-appellant's complaint and denying his Motion for Summary Judgment on Count I. Summary judgment is authorized "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Rule 74.-04(c) (1987). "In no case shall summary judgment be rendered on issue triable by jury or the court without a jury unless the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law." Rule 74.04(h) (1987). Summary judgment is a drastic remedy and "on appeal, review is made of the entire record in a light most favorable to the party against whom summary judgment is entered." *Fisher v. Scott & Fetzer Co.*, 664 S.W.2d 662, 663 (Mo.App.1984), citing *E.O. Dorsch Electric Co. v. Plaza Construction Co., Inc.*, 413 S.W.2d 167, 169 (Mo.1967).

In Count I of cross-appellant's Second Amended Complaint, he alleges that his Kansas City general agency constitutes a franchise for the purpose of § 407.400(1), RSMo 1986, and that cross-respondent violated § 407.405, RSMo 1986, by failing to provide cross-appellant 90 days' notice prior to termination of the agency. The regulation of insurance practices is governed by Chapters 374–385, RSMo 1986. The trial court did not err.

Cross-appellant next claims the trial court erred in granting cross-respondent's motion for summary judgment on Count II of cross-appellant's complaint. Count II alleged that cross-respondent made oral promises to cross-appellant and in consideration of those oral promises, cross-appellant left his position as second Vice–President of Mutual Benefit to purchase and manage the Kansas City agency, and that cross-respondent then breached that oral contract.

An employment contract for more than one year is within the Statute of Frauds, § 432.010, RSMo 1986. *Mayer v. King Cola Mid–America, Inc.*, 660 S.W.2d 746, 748 (Mo.App.1983). Cross-appellant's alleged oral contract for employment was to extend beyond one year. Cross-appellant fails to establish that any enforceable oral agreement existed, or that the Statute of Frauds should not apply. The trial court did not err in granting cross-respondent's Motion for Summary Judgment on Count II.

Cross-appellant alleges the trial court erred in granting cross-respondent's motion for summary judgment on Count III of cross-appellant's complaint. Count III alleges a claim for breach of fiduciary duty.

In order to establish a fiduciary relationship, cross-appellant must show certain basic elements. These are:

(1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3)

there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

*Chmieleski v. City Products Corporation,* 660 S.W.2d 275, 294 (Mo.App.1983).

Cross-appellant has failed to establish any of these elements. The trial court properly granted cross-respondent's motion for summary judgment on Count III.

## VII

The trial court's judgment as to appellant's counterclaim for specific performance of the settlement agreement is affirmed. The summary judgments in favor of appellant on the cross-claims of violation of the franchise law, breach of oral contract, and breach of fiduciary duty are affirmed. The judgments for fraud, breach of contract and conversion are reversed.

██ On the record before us, it is clear that either by reason of the terms of the employment contract or by reason of the transfers of the property during the never finalized settlement negotiations, there are items for which respondent is entitled to compensation. Under the contract, he is entitled to an accounting and payment for renewal commissions as they come due. Respondent is entitled to the reasonable value of his furniture less any payments made to either the seller or on financing paper secured by the furniture. Respondent is entitled to compensation for a percentage of the lease improvements paid by him equal to the percentage of the lease term taken over by appellant. The record is unclear, but if appellant or its employees in fact used the athletic tickets, then respondent is entitled to reimbursement for the athletic tickets.

The trial court did not err in excluding evidence of respondent's alleged debts to appellant, no counterclaim having been filed therefore by appellant.

We believe under the authority of *Zimmerman v. Associates Discount Corpora-tion,* 444 S.W.2d 396 (Mo. banc 1969) and *Delay v. Douglas,* 164 S.W.2d 154 (Mo.App. 1942), respondent, if he requests, would be entitled to file additional pleadings asserting a right to damages for these and similar items. In the event the trial court cannot assess these damages based on the existing record, or that such cannot be stipulated by the parties, then the trial court may in the alternative, order a new trial.

We reverse in part and affirm in part and remand with directions to assess damages and costs consistent with this opinion or in the alternative, order a new trial. If finally determined on the record, allowable interest and all costs should be assessed against appellant.

BILLINGS, C.J., and BLACKMAR, DONNELLY, ROBERTSON and HIGGINS, JJ., concur.

RENDLEN, J., concurs in result.