ANGLIN ENGINEERING CO.,
Plaintiff/Respondent,

v.

J.E. BARRY CO., INC.,
Defendant/Appellant.

No. 67366.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 31, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 11, 1995.

Application to Transfer Denied
Jan. 23, 1996.

---

**634**

James E. Godfrey, Jr., Godfrey and Fenlon, St. Louis, for Appellant.

Joseph H. Guffey and Omri E. Praiss, St. Louis, for Respondent.

CRANDALL, Judge.

Defendant, J.E. Barry Company, Inc. (Barry), appeals from the judgment of the trial court, entered pursuant to jury verdicts, in favor of plaintiff, Anglin Engineering Company (Anglin), in a breach of contract action. We affirm in part and reverse in part.

The evidence, viewed in the light most favorable to the verdicts, established that Barry was a mechanical contracting company specializing in industrial piping. J.S. Alberici Construction Company, Inc. (Alberici) was serving as general contractor on a project to modernize a brewhouse located at Anheuser Busch, Inc. (brewery). Alberici hired Barry to replace the pipes, valves, and in-line controls in the brewhouse (project). Barry in turn hired Anglin to provide the isometric drawings for the project. Barry used the drawings to order, fabricate, and install the pipes.

At a meeting with Barry on January 15, 1990, Anglin's design manager, Michael Ang-lin, quoted the normal, or what he termed "street," rates for the project at $45.00 per hour for his time, $40.00 per hour for overtime and moonlighting workers, and $35.00 per hour for daytime workers. Anglin began work on the project that day. Sometime later, Anglin received a "purchase order," dated February 2, 1990, setting forth the agreement to provide services for Barry on the project and stating that the rates for Anglin's work were to be "mutually agreed upon."

Barry furnished Anglin with the blueprints of the brewhouse which depicted the existing pipe system. Anglin prepared the isometric drawings from the blueprints. As a result of discrepancies between the pipe system in place in the building and the blueprints, some of the isometric drawings were inaccurate and Anglin was required to do more drawings than originally anticipated. It also became necessary for Anglin to compare the isometric drawings with the existing pipe system on site, a procedure called "field verification."

Anglin sent bi-monthly invoices to Barry detailing the work completed on the project and the amount charged therefor, using the hourly rates set forth by Michael Anglin at the January 15 meeting. Barry paid the first five invoices, retaining ten percent of the amount of each invoice in accordance with their agreement. Sometime after June 1, 1990, after Barry failed to pay the next seven invoices, Barry's vice-president, Barry Burke, assured Anglin that payment was forthcoming. Anglin continued to work on the project until June 22, 1990, when Barry terminated Anglin's services. Barry claimed that it never agreed to pay the hourly rates charged by Anglin; but during the six months Anglin worked on the project, it continually attempted to negotiate lower rates. At the time of termination, Anglin claimed that Barry owed it $98,617.99.

Anglin brought the present action. The case was submitted to the jury against Barry on three counts [1]: Count I was a breach of

---

1. Anglin's petition alleged other counts against two additional defendants, Alberici and the brewery. Defendants asserted various counterclaims against Anglin. By the time the case was submit-ted to the jury, however, Barry was the sole defendant and only three counts of Anglin's petition remained for the jury's consideration.

contract claim; Count II was a quantum meruit claim; and Count III was a fraud claim. The jury returned verdicts in favor of Anglin on Count I, awarding damages of $143,489.50 ($98,617.99 plus interest of $44,-871.51); and in favor of Anglin on Count III, assessing damages at $35,000.00.

In its first point, Barry contends the trial court erred in refusing to direct a verdict and to enter judgment notwithstanding the verdict on Anglin's breach of contract claim. It argues the contract with Anglin was unenforceable under § 327.461, RSMo (1994), because Anglin was providing engineering services without being a registered or authorized professional engineer.[2]

■ In reviewing a ruling on a motion for directed verdict and judgment notwithstanding the verdict, the appellate court views the evidence in the light most favorable to the verdict. *Garrett v. Overland Garage and Parts, Inc.,* 882 S.W.2d 188, 190 (Mo.App. E.D.1994). The prevailing party is entitled to the benefit of all reasonable inferences favorable to the verdict, and any evidence *unfavorable to the verdict is disregarded. Id.*

Section 327.461 provides that "[e]very contract for ... engineering ... services entered into by any person who is not a ... registered or authorized professional engineer ... shall be unenforceable by the unregistered or unauthorized ... professional engineer...." Professional engineer is defined by § 327.181, RSMo (1994) in relevant part:

> Any person practices in Missouri as a professional engineer who renders or offers to render or holds himself out as willing or able to render any service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning and de-

sign of engineering works and systems, ... engineering surveys, and the inspection of construction for the purpose of assuring compliance with drawings and specifications, any of which embraces such service or work either public or private, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, or projects ...; *or* who uses the title "professional engineer" or "consulting engineer" or the word "engineer" alone or preceded by any word indicating or implying that such person is or holds himself out to be a professional engineer, or who shall use any word or words, letters, figures, degrees, titles or other description indicating or implying that such person is a professional engineer or is willing or able to practice engineering.

(Emphasis added).

We first consider whether Anglin's preparation of the isometric drawings constituted services rendered by a professional engineer under § 327.181. At trial, Barry's project manager testified that making isometric drawings generally did not require a professional engineer:

Q. Is it a requirement that a person be a professional engineer to do isometric drawings like this?

A. No. Generally they aren't.

Q. Who generally does isometric drawings?

A. Designers.

Q. And do pipefitters also do it?

A. Yes, they can....

Michael Anglin testified that Anglin did not perform professional engineering functions:

Q. ... [W]hat work, if any, did Anglin do for the J.E. Barry project that was professional engineering?

A. We did no professional engineering on this project.

In addition, there was no evidence in the record, expert or otherwise, that preparing

---

**2.** We do not consider whether Anglin was holding itself out as a professional engineering firm either when it rendered services or when it used the word "engineering" in its company title. The allegation in Barry's motion for directed

verdict and in its motion for new trial was insufficient to preserve that issue for appellate review. *See Browning v. Salem Memorial Dist. Hosp.,* 808 S.W.2d 943, 949 (Mo.App.1991).

isometric drawings required "engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences" or that such work constituted "creative work" under § 327.181. Moreover, Barry admitted that it accepted the isometric drawings without the seal of a professional engineer affixed thereon.

■ The evidence in the record was sufficient to establish that Anglin did not render professional engineering services when it prepared the isometric drawings for the project. Anglin therefore did not fall within the definition of § 327.181 when it did the drawings.

We next consider whether Anglin functioned as a professional engineer under § 327.181 when it conducted "field verifications." The statute provides that the practice of professional engineering includes "the inspection of construction for the purpose of assuring compliance with drawings and specifications."

The evidence was that the blueprints of the brewhouse, which were provided to Anglin, did not accurately depict the pipe system in place. Michael Anglin testified that after Anglin started the project the discrepancies between the isometric drawings and the blueprints of the brewhouse necessitated the reconciliation of the isometric drawings of the new pipe system with the existing pipe system:

Q. ... [W]hat kind of problems did you run into immediately with this project?

A. ... The next thing we ran into was after we took these documents that were provided to us ... to the field, comparing it to the existing system that was out there plus the new system we were trying to install. There was a tremendous amount of errors on these drawings that did ... not reflect exactly what was in the field.

Q. When you talk about a field verification, what does that involve?

A. Physically walk out into the brewhouse itself and compare what's actually in the brewhouse as to what these

people had put on the documents and trying to show in the drawings exactly what's in the field. They weren't successful in all cases.

Q. When you're talking about the documents, you're referencing the blueprint documents?

A. Yes.

Barry Burke, Barry's vice-president, testified as follows about Anglin's field verifications of the drawings:

Q. And in fact, the purpose of hiring [Anglin] was for them to provide those engineering services of the design and in-field verification?

A. Yes. Some field verification came up when we started the job. We were realizing that Anheuser Busch's plans weren't working....

Q. Okay. And so, can you describe what the process of field verification is?

A. Field verification is [when] you transfer your data from the original drawings, put them on isometric drawings, take those drawings, go out into the field and see if there is [sic] any interferences, if it's going to work per Anheuser Busch's drawings.

■ The evidence was sufficient to demonstrate that the field verifications did not constitute the practice of engineering. The drawings were not used to construct the brewhouse building and Anglin did not inspect the construction of the brewhouse. Rather, after the project started, Anglin became aware that the blueprints did not accurately reflect the pipe system in the brewhouse. Thus, the blueprints could not be used exclusively to prepare the isometric drawings. To assure the accuracy of the isometric drawings, it became necessary for Anglin, as part of the drawing process, to compare its drawings with the pipe system actually in the brewhouse and not just to rely on the blueprints showing the pipe system. The field verifications were not related to inspecting the "construction" of the brewhouse, but were solely related to verifying how accurately the blueprints reflected the pipe system already in place in the brewhouse. Given the nature of the field verifica-

tions in this case, Anglin's activities did not fall within the scope of § 327.181.

There was substantial evidence in the record that Anglin did not engage in the practice of professional engineering either when it made the isometric drawings or when it performed field verifications. Thus, Anglin was not practicing as a professional engineer, as defined by § 327.181, when it worked on the project. The contract between Anglin and Barry was therefore enforceable, because § 327.461 did not bar its enforcement. Barry's first point is denied.

In its second point, Barry contends the trial court erred in refusing to grant judgment notwithstanding the verdict because the agreement between Barry and Anglin was unenforceable. It argues that there was no meeting of the minds as to the rate of compensation for Anglin's work because the purchase order only described Anglin's rates as "mutually agreed upon." Anglin counters that there was an oral agreement with Barry that the rates were the prevailing "street rates" of $45.00 per hour, $40.00 per hour, or $35.00 per hour, depending on the type of employee performing the service.

In determining whether a meeting of the minds occurred and whether the parties reached an agreement, the court looks to the intention of the parties as expressed or manifested in their words or acts. *Brand v. Boatmen's Bank of Cape Girardeau,* 824 S.W.2d 89, 91 (Mo.App.1992).

The evidence does not support Barry's contention that Anglin's rates were too indefinite to enforce. One of Barry's employees who worked in operations management testified he accepted Anglin's rates on behalf of Barry:

Q. Were you involved with the negotiations with Anglin Engineering?

A. Yes, I was.

\* \* \* \* \* \*

Q. ... And on that day was it your understanding on behalf of J.E. Barry that you were accepting these rates of hourly charges from Anglin Engineering?

A. Yes, it were [sic].

\* \* \* \* \* \*

Q. ... So, your understanding of the rates that were going to be charged by Anglin and accepted by J.E. Barry was between $30.00 and $50.00 for their services, correct?

A. Yes.

Barry's project manager also testified as to Anglin's rates for the isometric drawings:

Q. And what was the discussion that you had with Mr. Anglin with respect to rate or hourly rate charge that Anglin was going to charge J.E. Barry for this work?

A. He gave us some information on rates ... of $45.00 an hour for the supervisor and $35.00 an hour for daytime work and $40.00 for evening work.

Furthermore, the evidence established that Barry accepted and paid the first five invoices sent by Anglin. The invoices detailed the work completed and the rates charged. It can be inferred from Barry's payment of the first five invoices that there was an implied acceptance of the rates charged by Anglin. *See Moore v. Kuehn,* 602 S.W.2d 713, 718–719 (Mo.App.1980).

The contract between Barry and Anglin was enforceable because the rate of compensation was definite. Evidence of the oral agreement and of Barry's conduct was sufficient to establish the existence of a contract to pay Anglin's rates. Barry's second point is denied.

In its third point, Barry asserts the trial court erred in submitting Anglin's fraud claim (Count III) to the jury because there was insufficient evidence to establish the requisite elements of fraud. Anglin contends it was induced to continue generating isometric drawings by Barry's representations that Anglin would be paid.

The essential elements of fraud are as follows: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge or ignorance of its falsity; (5) the speaker's intention that it should be acted on by the person and in the manner reasonably contemplated; (6) the bearer's ignorance of

the falsity of the representation; (7) the bearer's reliance on the representation being true; (8) his right to rely thereon; and (9) his proximately caused injury. *Emerick v. Mutual Ben. Life Ins. Co.*, 756 S.W.2d 513, 519 (Mo. banc 1988). The failure to establish any one of the elements of fraud is fatal to recovery. *Id.*

■ Here, Anglin's assertion that it continued to furnish the isometric drawings in reliance upon Barry's assurances of payment does not establish the requisite element of reliance on Barry's representation. Anglin's inducement to continue to prepare the drawings was based upon its contract with Barry, not upon additional assurances of payment given during the course of the contractual relationship. Anglin performed its contractual duty by furnishing the drawings and was entitled to payment therefor. Barry's promise to pay for the drawings six months after Anglin began work pursuant to the contract was superfluous, because Barry was obligated to pay under the terms of the contract. Barry's failure to perform under the contract by refusing to pay Anglin for the drawings, after it assured Anglin it would pay, constituted merely breach of contract and did not rise to the level of fraud.

■ Anglin failed to establish that Barry's representation regarding payment induced it to continue performing. Anglin thus did not establish reliance on Barry's representation, an essential element of a fraud action. The trial court erred in submitting Count III to the jury. Barry's third point is granted.

In its fourth point, Barry charges error in the trial court's refusal to set aside the verdict in favor of Anglin on the fraud count (Count III). Barry posits there was no evidence of damages except the amount due under the contract. In view of our holding under point three that Anglin did not make a submissible case of fraud, this point is rendered moot.

In its final point, Barry asserts the trial court erred in refusing to allow it to read into evidence portions of the testimony given by Anglin's president, Mark Dickhaus, in a prior court proceeding between the parties, on the basis that the testimony constituted an ad-

mission against interest. The testimony Barry offered was as follows:

Q. Did you and J.E. Barry reach some kind of agreement as to how you would be paid for your services?

A. Yes we did.

Q. What was that? Was that agreement reduced to writing?

A. Yes it was.

Q. Was it signed by both parties?

A. It was—it was a purchase order issued from Barry to Anglin Engineering.

Q. Was it signed?

A. It was signed by Barry.

Q. Did you agree with those terms?

A. I agreed to the terms in the purchase order, yes, sir.

Barry argues that this testimony was "directly contrary" to Dickhaus' testimony at trial that there was an oral agreement as to Anglin's specific rates.

■ A trial court has considerable discretion in the exclusion of evidence; and absent an abuse of that discretion, its action will not be grounds for reversal. *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990). There are three requirements necessary for the admission of out-of-court statements as admissions of a party-opponent: (1) a conscious or voluntary acknowledgement by a party-opponent of the existence of certain facts; (2) the matter acknowledged must be relevant to the cause of the party offering the admission; and (3) the matter acknowledged must be unfavorable to or inconsistent with the position now taken by the party-opponent. *Copeland v. Mr. B's Pool Centers, Inc.*, 850 S.W.2d 380, 382 (Mo.App.E.D.1993).

The element absent in the present action is the third element. At trial, Mark Dickhaus testified that the purchase order constituted the written agreement between the parties and that the parties had agreed orally to pay Anglin's hourly rates of $45.00, $40.00, and $35.00. In the prior court proceeding, Mark Dickhaus' testimony was that Anglin agreed to the terms of the written purchase order, which merely recited that the rates were "mutually agreed upon." Dickhaus' previous

testimony did not directly contradict his testimony at trial that there was an oral agreement as to Anglin's rates, because Anglin considered its rates the "mutually agreed upon" rates referred to in the purchase order. Thus, the offered testimony was not inconsistent with the trial testimony and did not constitute an admission against interest. The trial court did not abuse its discretion in excluding the proffered testimony. Barry's fifth point is denied.

That portion of the trial court's judgment in favor of Anglin on Count I is affirmed. That portion of the judgment in favor of Anglin on Count III is reversed.

CRAHAN, P.J., and DOWD, J., concur.