**HOMAR ENTERPRISES, INC., Appellant,**

v.

**John W. DAAKE, Mildred B. Daake, and Chesterfield Management Associates, L.P., Respondents.**

No. 70871.

Missouri Court of Appeals, Eastern District, Division Three.

Oct. 7, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 1997.

Application for Transfer Denied Jan. 27, 1998.

Summers, Compton, Wells & Hamburg, Steven M. Hamburg, St. Louis, for appellant.

Lacks, Newman & Cohen, P.C., Burton Newman & G. William Wynne, St. Louis, for respondents John Daake & Mildred Daake.

Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., Richard S. Bender, Joshua M. Schindler, St. Louis, for respondent Chesterfield Management Associates, L.P.

KAROHL, Judge.

Homar Enterprises, Inc. (Homar) as lessee brought a declaratory judgment action and a second count for specific performance against John and Mildred Daake as former lessors and Chesterfield Management Associates, L.P. (CMA) as present lessor regarding the rights and duties of the parties under a commercial lease. Homar appeals the declaratory judgment and the denial of its request for specific performance.

The parties to this dispute have disagreed and litigated over a number of years regarding who is responsible for repairs of the leased premises known as Chesterfield Manor. In June of 1980, Edgewater Health Care, Inc. (Edgewater), the original lessor, leased Chesterfield Manor at 14001 Olive Street Road in St. Louis County to Health Systems Management, Inc., the original lessee. The lease provided for a term beginning on July 1, 1980 and expiring on June 30, 1983. It also contained an option for lessee to extend the period of the lease for six additional 3 year periods. With all renewals exercised, the lease will expire on June 30, 2001. The property was and is operated as a nursing home.

In 1982, Health Systems Management, Inc. assigned its lease interest to Homar. Around December 30, 1988, Edgewater, the original lessor, assigned its interest in the lease to John and Mildred Daake. The Daakes were the landlord of Homar under the lease until June 9, 1995. In June of 1995, they transferred the lease and their reversion in Chesterfield Manor to CMA. Dr. and Mrs. Kent Snowden and Dr. and Mrs. Jack Gennaoui are the limited partners of CMA.

Homar has been involved in three lawsuits pertaining to its lease of Chesterfield Manor. All litigation pertaining to the parties and the lease of Chesterfield Manor concerned conflicting interpretations of paragraph 11 of the lease. Paragraph 11 provides, in relevant part:

The LESSORS agree to be responsible for any expense or cost in replacing or the restoration of any capital improvements or equipment which fail or otherwise are rendered useless. *So as to sustain the continuing operation of the facility,* the LESSORS upon notice, will promptly replace or restore such capital improvements to immediate use. This provision shall apply whether the loss of use is a casualty loss or otherwise. For purposes of this LEASE capital improvements or equipment which fail or are rendered useless in spite of routine maintenance by LESSEES are those units of such size and cost as are indispensible in whole or part to the continuous operation of the Nursing Home. Examples of such capital improvements are the structure itself, foundations, piers, *roof, roofing,* outside walls, and inside walls, foundation settlings. However, LESSEES agree that they will establish a reserve which will accrue at the rate of $3,600.00 per year, not to exceed $25,-000.00. This accrued amount will be used for the replacement of equipment such as electrical, air conditioning, heating, both comfort and water, which fail or are otherwise rendered useless, but will not be used for capital improvements or equipment as described above. Such reserves if not expended remain property of LESSEES.

(emphasis added).

The first lawsuit began in 1984. At the time of the lawsuit, Edgewater was lessor of the property. Homar, as lessee, sought reimbursement of amounts spent for restoration and replacement of capital improvements and equipment. The jury found in favor of Homar for $38,184.33 against Edgewater. Homar initiated a second lawsuit in January of 1987. It alleged, in an amended petition, Edgewater, as lessor, failed to make repairs or pay for repairs from April 1, 1986, through December 31, 1988. The parties settled before trial.

Homar filed the third lawsuit, the subject of this appeal, in January of 1992. The original petition was against the Daakes. It contained three counts. In Count I, Homar alleged breach of contract and sought damages for reimbursement of amounts spent by Homar to replace and restore capital improvements and equipment. Count II requested an order for specific performance to compel the Daakes to perform the repair covenant in the lease by making "all repairs, replacements and restoration ... to the extent not already made by Homar." Count III sought a declaratory judgment which would interpret the repair covenant and obligate the Daakes to make needed and future repairs.

The case was originally filed in St. Louis County Circuit Court, removed to federal court, and then remanded to state circuit court. Before remand, the Daakes filed a confession of judgment as to Count I. On May 23, 1995, the United States District Court for the Eastern District of Missouri accepted the Daakes confession of judgment on Count I. Finding "no just reason for delay," the court entered a judgment for $85,870 on Count I of the first amended petition as final. On June 9, 1995, the Daakes conveyed their interest in the Chesterfield Manor property to CMA. CMA acquired the property with knowledge of the pending lawsuit and of the property's condition. Homar added CMA as a defendant on the claims for declaratory judgment and specific performance.

After entry of judgment in federal court on the original Count I of the first amended petition, Homar filed a second amended petition in the state circuit court which named CMA as co-defendant with the Daakes. The second amended petition contains two equitable counts. In Count I Homar prays for an order for specific performance directing lessors to perform under the lease "by repairing, replacing and restoring the leased premises to a tenantable and habitable condition, including, but not limited to, any and all repairs, replacements and restoration ... to the extent not already made by Homar." The circuit court denied relief on Count I, the specific performance request. As to the declaratory relief sought in Count II, the court declared the parties' obligations under the lease. It determined: (1) the lease requires Homar to establish a cash reserve not to exceed $25,000 available for future need; (2) the reserve does not limit Homar's overall

responsibility for repair or replacement; (3) CMA is responsible for "any expense or cost in replacing or the restoration of capital improvements or equipment which fail or are otherwise rendered useless"; (4) excluded from the term capital . improvements are "electrical, air conditioning, heating, both comfort and water, equipment, and other such major units"; and (5) CMA is responsible only for restoring or replacing items of capital improvement that become useless despite Homar maintaining them in a serviceable condition, i.e., any capital improvements that become useless despite proper maintenance are the responsibility of CMA.

In 1991 Richard Kutta, a professional engineer acting for Homar, prepared a list of all conditions in need of repair or replacement. The trial court found CMA was not liable for any items on the list because the need for repair arose before it acquired the property in June of 1995.

Homar raises nine points on appeal. We will address the points out of order.

■ First, in Point I, Homar argues the trial court erred in its determination that it had an adequate remedy at law, and as a result was not entitled to specific performance. In its findings of fact and conclusions of law, the trial court concluded Homar failed to prove it had no adequate remedy at law. The trial court determined that monetary relief was Homar's adequate remedy at law. The experience of three lawsuits for reimbursement demonstrates that monetary relief is not an adequate remedy at law. For an adequate remedy at law to defeat a claim for specific performance, the remedy at law must be certain, complete and as efficient as specific performance. *Snip v. City of Lamar*, 239 Mo.App. 824, 201 S.W.2d 790, 798 (1947). The trial court declared and there appears to be no dispute that the lease required lessor to make repairs under paragraph 11 of the lease. CMA acquired the property and lease with knowledge of the existing need for some capital repairs. To require Homar to continue to make repairs which lessor agreed to make and then seek reimbursement is not as efficient as specific performance. This is the third lawsuit involving Homar and its lessor regarding enforcement of the repair covenant in the lease of Chesterfield Manor. The lease does not expire until 2001. Without a decree of specific performance, Homar may be required to sue its lessor as it has in three lawsuits. This is unnecessarily burdensome and is not an adequate remedy at law.

■ Second, in Point IV, Homar challenges the trial court's finding that the judgment entered in the United States District Court barred it from additional relief because its equitable claims were barred by the doctrine of res judicata. Res judicata does not apply for several reasons. For res judicata to apply there must be: 1) identity of the thing sued for, 2) identity of the cause of action, 3) identity of persons and parties to the action, and 4) identity of the quality of the person for or against whom the claim is made. *Gardner v. City of Cape Girardeau*, 880 S.W.2d 652, 655 (Mo.App. E.D.1994). Additionally a "final judgment on the merits must have been rendered in the underlying action" for the application of res judicata to be proper. *Jordan v. Kansas City*, 929 S.W.2d 882, 885 (Mo.App.W.D.1996).

■ In the present case all of the elements of res judicata are not present. Reimbursement of past expenses for repairs was the subject of the original count which was decided in the Federal District Court. It *may* have also involved expenses for some needed repairs. It if did, then an order of specific performance may be fashioned so as to prevent a double recovery. Res judicata requires identity of the thing sued for. In paragraph 17 of its findings of fact, the trial court found that Homar did not present any evidence "regarding which specific items ... were covered by the final judgment in federal court." Without the ability to identify what was decided in the federal court judgment, the claim for specific performance cannot be precluded. It is uncertain whether the requirement of identity of the claim has been met.

CMA did not argue and the trial court did not attempt to apply collateral estoppel. The application of collateral estoppel would benefit Homar, not CMA, because each money judgment depended on a finding lessor

**358**

breached its duty of repair and owed reimbursement as damages.

 Furthermore, the present case involves a covenant to keep in repair. This covenant is capable of repeated breaches. Prior recovery of damages for breach of a continuing covenant will not bar a subsequent suit seeking damages for breach of the same covenant since the last recovery. *See, McGee v. St. Joseph Belt Ry. Co.,* 232 Mo. App. 639, 110 S.W.2d 389, 391 (1937). A covenant to keep in repair is a continuing covenant. *Plaza Investment Co. v. Abel,* 8 Mich.App. 19, 153 N.W.2d 379, 380 (1967) (holding a covenant to keep in repair in a lease is capable of constant or continuing breach so that recovery of damages for breach of such covenant will not bar a subsequent suit for damages suffered from the continuing breach since the last recovery). The money judgment in the United States District Court on Homar's original Count I which alleged breaches of the repair clause does not bar Homar from obtaining an order for specific performance of the same covenant.

 Third, in Point II Homar argues the trial court erred in failing to hold CMA liable for all restoration or replacement of capital improvements and equipment whether the need for repair or restoration arose before or after CMA acquired the property. CMA acquired the property with knowledge of the repair clause in the lease; with knowledge of the needed repairs; and with knowledge of this lawsuit. CMA admits its responsibility for "future" repairs of capital improvements at Chesterfield Manor. Generally, a landlord's covenant to repair may run with the land and obligate subsequent owners to make repairs which are necessary under the continuous covenant. However, CMA argues that once the covenant to repair was broken by its predecessors, it became a chose in action, which does not run with the land. Thus, CMA argues, the covenant cannot be enforced against it for repairs needed at the time of its purchase. The argument ignores CMA's continuous contractual duty to keep the premises in repair. The day after CMA became owner-lessor of Chesterfield Manor, it breached its duty to keep the

premises in repair when it failed and refused to repair the existing defects which could prevent "continuing operation of the facility." As a purchaser for value with notice of the lease, CMA took subject to the lease and its covenants. *C & J Delivery v. Vinyard & Lee & Partners,* 647 S.W.2d 564, 569 (Mo.App. 1983). It became an owner with a claim for present and future rent so long as it maintained the rented property "so as to sustain the continuing operation of the facility." A breach by CMA did not depend on Homar's showing the needed repairs became necessary *after* CMA acquired title.

 Fourth, in Point III, Homar asserts the trial court erred in interpreting the meaning of the repair clause. It sought construction and a declaration of the parties' rights and obligations under paragraph 11 of the lease. The declaratory judgment will be affirmed "unless it is not supported by substantial evidence or is against the weight of the evidence or the court has erroneously declared or applied the law." *Transamerica Ins. Co. v. Pennsylvania National Ins. Cos.,* 908 S.W.2d 173, 175 (Mo.App. E.D.1995). Generally, the court's declaration merely reiterated the language of paragraph 11 of the lease. It failed to specifically designate what items of repair are the responsibility of the landlord or tenant. It neglected to define the term "routine maintenance" which is necessary in determining whether the lessor has responsibility to replace items which have failed. On remand the court may resolve these concerns.

 Fifth, in Point VII, Homar challenges the trial court's exclusion of its Exhibit 50. It contends the exhibit was admissible as CMA's declaration against interest. A declaration against interest is admissible as an exception to the hearsay rule and constitutes statements "made by persons not a party or in privity with a party to the suit." *State v. Grant,* 560 S.W.2d 39, 42 (Mo.App.1977)(quoting *Carpenter v. Davis,* 435 S.W.2d 382, 384 (Mo. banc 1968))(further citation omitted). Exhibit 50 was a letter written by an employee of a party, CMA, addressed to the mortgagee of Chesterfield Manor, Snowden Investment Company. As

a statement of a party to the lawsuit, it may be an admission, but it is not a declaration against interest.

■■■■ A relevant statement made by a party, however, may be admissible as an admission. An admission of a party opponent is not hearsay. *State v. Brown*, 833 S.W.2d 436, 438 (Mo.App. W.D.1992). The hearsay rule protects a party from out-of-court declarations of individuals who cannot be cross-examined. *Id.* Objecting to an admission of a statement made by a party based on the grounds of hearsay is meaningless because there is no need for self-cross-examination. *Id.* at 438–39. For an admission by a party-opponent to be admissible: 1) the statement must be a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts; 2) the matter acknowledged must be relevant to the cause of the party offering the admission; and 3) the matter acknowledged must be unfavorable to or inconsistent with the position now taken by the party-opponent. *Anglin Engineering Co. v. J.E. Barry Co., Inc.*, 912 S.W.2d 633, 639 (Mo.App. E.D.1995). If any of the three requirements are not met, the statement is properly excluded on the grounds of relevancy, not hearsay. *See, State v. Brown*, 833 S.W.2d at 439.

■■■■ However, whether the trial court erred in excluding Exhibit 50 is immaterial. Paragraph 11 of the lease requires lessor to make repairs to permit lessee to use the leasehold as intended. Whether the exhibit contains an admission or not does not alter CMA's legal duty. Lessor has a continual duty under the lease to make repairs as stated in paragraph 11 of the lease regardless of whether it admitted to its obligation in the letter to its mortgagee. Lessor's obligation was a matter of law.

■■■■ Sixth, in Points VIII and IX, Homar makes two points regarding the interpretation of the terms of the lease. In interpreting lease agreements, we follow the rules of construction governing contract. *Kamada v. RX Group Ltd.*, 639 S.W.2d 146, 148 (Mo. App.1982). Both points concern whether terms in the lease are ambiguous. Whether terms of an agreement are ambiguous is a

question of law, and an ambiguity is said to exist only when the term is reasonably susceptible to more than one meaning when words are given their plain meaning as understood by the average person. *North Central County Fire Alarm System, Inc. v. Maryland Heights Fire Protection District*, 945 S.W.2d 17, 18 (Mo.App. E.D.1997). A contract between parties is not rendered ambiguous merely because the parties do not agree upon the proper construction. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973).

■■■■ We find that as to Point VIII, there is no ambiguity in the lease. In Point VIII, Homar argues the trial court misinterpreted its obligation under paragraph 11 of the lease regarding the establishment of a cash reserve. The relevant portion of paragraph 11 states:

> However, LESSEES agree that they will establish a reserve which will accrue at the rate of $3,600.00 per year, not to exceed $25,000.00. This accrued amount will be used for the replacement of equipment such as electrical, air conditioning, heating, both comfort and water, which fail or are otherwise rendered useless, but will not be used for capital improvements or equipment as described above.

The trial court refused Homar's request to limit its overall responsibility for repair or replacement to a one-time cash reserve of $25,000 for the entire life of the lease. In its order, the trial court determined that paragraph 11 "does not limit Homar's overall responsibility for repair or replacement to Twenty–Five Thousand Dollars. This condition of the lease merely requires Homar to set those sum [sic] aside." Paragraph 11 makes no reference to Homar's obligation to make repairs or replacement beyond the cash reserve or that the cash reserve shall be the full extent of the lessee's responsibility towards repairs. In fact, earlier in paragraph 11, lessee agreed to "maintain the facility in a serviceable condition." The language of the cash reserve provision is clear. Point denied.

Homar's ninth point argues there is an ambiguity in the meaning of "routine maintenance" as used in paragraph 11 of the lease. It contends the trial court erred in excluding testimony regarding the parties' understand-

ing of what constitutes routine maintenance for the purposes of the lease. The term routine maintenance is susceptible to more than one interpretation when the words are given their plain meaning. By way of offer of proof and through the testimony of Mr. Vander Maten, Homar provided the court with its interpretation of the meaning of routine maintenance. In its judgment, the trial court failed to define routine maintenance, nor did the court make any reference to it. On remand, the trial court must declare the meaning of the term routine maintenance as used in paragraph 11 of the lease in order to declare fully the rights and duties of the parties.

In Point V, Homar argues the trial court erred in finding it could not enter an order for specific performance against the Daakes. Nowhere in its findings and conclusions did the trial court relieve the Daake's of liability. Instead, it entered judgment in favor of the Daakes based on a conclusion that res judicata prevented Homar from pursuing any monetary relief. This was error. However, the declaratory judgment and specific performance counts were in Homar's amended petition filed after remand from the Federal District Court and subsequent to the Daakes transferring their interest in Chesterfield Manor to CMA. A declaratory judgment and specific performance concerning the lease would not apply to the Daakes because they no longer own the property. The declaratory judgment may declare the rights and obligations of the present tenant and landlord. Declaration of prior rights and duties is not within the scope of declaratory judgment because it would not resolve an existing dispute. A specific performance order would be meaningful only to compel the present landlord to carry out its duties under the lease. Point denied.

We do not address arguments that are moot because of this opinion.

Reversed and remanded.

AHRENS, P.J., and CRANDALL, J., concur.