The BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Plaintiff,

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY, Defendant.

No. 98–2307–JWL.

United States District Court, D. Kansas.

March 2, 1999.

---

William P. Coates, Jr., Holman, Hansen & Colville, P.C., Prairie Village, KS, for Burlington Northern and Santa Fe Railway Company, plaintiff.

James F. Duncan, Robert B. Best, Jr, Brian Edward Engel, Armstrong Teasdale LLP, Kansas City, MO, for Kansas City Southern Railway Company, defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this diversity action, plaintiff Burlington Northern and Santa Fe Railway Company ("BNSF") seeks damages arising from defendant Kansas City Southern Railway Company's ("KCS") alleged breach of contract. The matter is presently before the court on the cross-summary judgment motions of plaintiff (doc. 46) and defendant (doc. 44). For the reasons set forth below, defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted in part and denied in part. Plaintiff is entitled to judgment in the amount of $751,845.46.

### I. Background

In January 1991, BNSF's predecessor in interest, Burlington Northern Railroad Company, and KCS entered into a "run-through" or locomotive interchange contract, whereby both parties strove to "obtain maximum utilization of locomotive units." The purpose of this contract was to facilitate the parties' sharing of units of power, known as "horsepower hours" in the railroad industry, and, according to the contract, "to provide for the uniform settlement of such matters as are customarily related to the operation and run-through of locomotive units."

Section III of the parties' agreement governs "Locomotive Unit Equalization and Caboose Rental." Section 3.4 provides, in pertinent part:

> The parties agree that not less than every three (3) months and upon request of either of the parties to whom locomotive horsepower hours are owing, the party owing said locomotive horsepower hours shall promptly place in service hereunder an additional locomotive unit or units as may be agreed are necessary to overcome any such deficit within the subsequent three-month period. The party not having a horsepower hour deficit shall withdraw an appropriate number of locomotive units to permit the assignment of the agreed upon number of additional locomotive units by the party in deficit. In the event of the inability or failure of the owing party to so place in service sufficient additional locomotive units to overcome the horsepower hour deficit, the party to whom the horsepower hours are owed shall have the option of (1) receiving the horsepower hours in kind over an additional period of time as may be agreed upon by the Chief Operating/ Transportation officers of the parties hereto, or (2) receiving payment for any remaining unequalized horsepower hours at a rate to be calculated by applying the formula contained in the statements marked Exhibit "A," attached hereto and made a part hereof, to the appropriate accounts of [Burlington Northern] or KCS, as the case may be, for the latest calendar year for which annual figures are available.

The uncontroverted facts reveal that on October 31, 1997, KCS owed BNSF 43,459,275 horsepower hours. On November 5, 1997, BNSF issued written notice to KCS regarding KCS' then-existing deficit. On January 31, 1998, at the end of the ninety-day period within which KCS was to settle its horsepower hours balance pursuant to the November 5, 1997 notice, the number of horsepower hours owed by KCS to BNSF totaled 135,854,985.

On June 12, 1998, BNSF filed its breach of contract action in the District Court of Wyandotte County, Kansas. Pursuant to 28 U.S.C. § 1441, defendant KCS subsequently removed the action to this court.

Plaintiff moves for summary judgment, claiming that defendant breached the express terms of the parties' contract, and that defendant's performance thereunder was not excused by KCS' commercial frustration, impracticability, and/or "time is not of the essence" defenses. Defendant moves for summary judgment, claiming that because it eliminated its horsepower hours deficit within a reasonable time, BNSF's acceptance of that performance effectively constitutes a waiver of defendant's breach.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if

"there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; see *Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. Choice of Law

As an initial matter, the court must determine what law governs the parties'

respective claims. A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, the court must look to Kansas law to determine which state's laws should be applied to the parties' respective claims.

■ The court notes that the parties' agreement contains what appears to be an express choice-of-law provision. Specifically, section 13.1 of the contract states that "all of the terms hereof shall be governed by the laws of the State of Missouri." The court applies the forum state's rule regarding the enforceability of a choice of law provision. *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990). Kansas courts have given effect to such provisions, and the court concludes that they would do the same here. *See id.* (applying Kansas law as provided by contract); *National Equip. Rental v. Taylor*, 225 Kan. 58, 61, 587 P.2d 870, 873 (1978) (applying a contractual choice of law provision where the transaction at issue at least had "a reasonable relation" to the denominated state). Accordingly, to the extent that the contract expressly provides that the contract's terms are governed by the laws of Missouri, issues of contractual construction will be addressed in light of Missouri law.

With respect to the law applicable to defendant's affirmative defenses, however, plaintiff maintains that because the choice-of-law clause does not specifically state that Missouri law governs "all disputes arising out of the Agreement," Missouri law applies only to the "terms" of the agreement, but not to defendant's affirmative defenses to performance due thereunder. Nevertheless, plaintiff concedes that few differences exist between Missouri and Kansas caselaw with respect to the issues of commercial frustration, impracticability of performance, and "time is of the essence." In light of plaintiff's concession that Kansas and Missouri law is virtually identical vis-à-vis defendant's affirmative defenses, the court will apply Missouri law.

## B. Commercial Frustration and/or Impracticability Defense

Plaintiff moves for summary judgment with respect to defendant's affirmative defenses of commercial frustration and impracticability of performance. Defendant resists summary judgment as to these defenses, claiming that its obligation to equalize its horsepower deficit within ninety days following BNSF's notice was temporarily excused due to an industry-wide "transportation emergency," an event unforeseen by either party.

■ As recently summarized by the Court of Appeals for the Western District of Missouri, under Missouri law,

> [t]he commercial frustration doctrine excuses performance of contractual obligations when a happening, not foreseen by the contractors, destroys, or nearly destroys, the contracted performance's value or the contract's purpose—provided the contractors did not cause the happening and were unable to avoid its consequence.

*American Laminates, Inc. v. J.S. Latta Co.*, 980 S.W.2d 12, 19 (Mo.Ct.App.1998) (citing *Howard v. Nicholson*, 556 S.W.2d 477, 481–82 (Mo.App.1977) (referencing RESTATEMENT (SECOND) OF CONTRACTS § 288)). The purpose of the commercial frustration doctrine "is to do equity—to intervene when enforcement of a contract would be unjust.... The doctrine determines where the courts should allocate risk for uncontemplated happenings which destroy, or nearly destroy, the value or purpose of a contract between two parties which have not brought on the happening." *Id.* at 20. The American Laminates court further noted that "[t]o preserve the certainty of contracts, we apply this doctrine sparingly—only when its application would not work an extreme hardship." *Id.* (citing *Howard*, 556 S.W.2d at 483).

The only reported Missouri state court case specifically examining the common law doctrine of impracticability under Missouri law dealt with "existing," rather than "supervening," impracticability. *Clayton X–Ray Co. v. Evenson,* 826 S.W.2d 45, 49 (Mo.Ct.App.1992). In that case, the court quoted Restatement (Second) of Contracts § 266(1) to define the parameters of the doctrine in cases where the event making a party's performance impracticable existed at the time that the contract was executed. *Id.* The *Clayton* court further described the impracticability doctrine by referring to a Missouri case in which Mo.Rev.Stat. § 400.2–615 entitled "Excuse by failure of presupposed conditions," Missouri's codified version of Uniform Commercial Code § 2–615, was considered. *Id.* The Clayson court explained that in *Missouri Public Service Co. v. Peabody Coal Co.,* 583 S.W.2d 721, 725–26 (Mo.App.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979), "this court asserted that 'the doctrine [of commercial impracticability] may be applicable upon the occurrence of a supervening, unforeseen event not within the reasonable contemplation of the parties at the time the contract was made. Such occurrence must go to the heart of the contract.' " *Id.*

In its memorandum in opposition to plaintiff's motion for summary judgment, defendant refers to its impracticability defense as "the impossibility/impracticability of performance doctrine," and then refers the court to Missouri cases in which the doctrine of impossibility is explored. In its response, plaintiff takes issue with defendant's "last minute" injection of an "impossibility" defense, a defense that plaintiff apparently perceives as an entirely new affirmative defense, which, plaintiff argues, was waived by defendant's failure to preserve it in the pretrial order. There is, however, no legal distinction between "impracticability of performance" and "impossibility of performance," and the court finds defendant's reliance on Missouri cases utilizing the phrase "impossibility" in lieu of, or in addition to, "impracticability" appropriate.

■ Under Missouri law, the impossibility doctrine excuses performance when "performance is rendered impossible by an Act of God, the law, or the other party." *Howard,* 556 S.W.2d at 481. The common law doctrine of impracticability is an outgrowth of the doctrine of legal impossibility. *See, e.g., United States v. Conservation Chem. Co.,* 661 F.Supp. 1416, 1422 (W.D.Mo.1987) ("The doctrine of impossibility has been tempered to some degree by characterizing it as 'impracticable.' ") Over time, the terms "impossibility" and "impracticability" have become somewhat interchangeable. Indeed, Comment d to Restatement (Second) of Contracts § 261 explains that

> [a]lthough the rule stated in this Section is sometimes phrased in terms of "impossibility," it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible. This Section, therefore, uses "impracticable," the term employed by Uniform Commercial Code § 2–615(a), to describe the required extent of the impediment to performance.

Restatement (Second) of Contracts § 261, cmt. d (1981); *see also Commonwealth Edison Co. v. Allied–General Nuclear Svcs.,* 731 F.Supp. 850, 855 (N.D.Ill.1990) (Posner, J.) (discussing the common law doctrine of impossibility and noting that it is "today often called 'impracticability' ").

As an apparent alternative to defendant's purported defenses of commercial frustration and/or impracticability/impossibility, defendant asserts that it need not satisfy the strict requirements of either doctrine because its performance was not entirely excused, but merely temporarily delayed, by the supervening "transportation emergency." Specifically, defendant urges this court to consider § 269 of the Restatement (Second) of Contracts, entitled "Temporary Impracticability or Frustration," which states:

Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration.

RESTATEMENT (SECOND) OF CONTRACTS § 269. Although Missouri courts have not previously dealt with the issue, in light of the references to the Restatement (Second) of Contracts made by Missouri courts while considering the doctrines of commercial frustration and impracticability, the court discerns no indication from Missouri caselaw that Missouri courts would not similarly seek guidance from the Restatement if faced squarely with the issue of "temporary" impracticability or commercial frustration.

The undisputed facts indicate that during the summer months of 1997, the merger of the Union Pacific and Southern Pacific railroads caused a widespread disruption in the railroad transportation industry. The merger effected a nationwide shortage of available locomotives, and so severe was the resulting transportation crisis that the Surface Transportation Board [1] ("STB") issued Emergency Service Order No. 1518 on October 31, 1997 in an effort to mitigate the situation. The order, which was twice extended, described the extent and severity of the then-existing railway congestion, and imposed intervention measures to facilitate the resolution of the transportation emergency.

Defendant argues that the gridlock experienced by the railroad industry prevented defendant's ability to equalize its horsepower hours deficit within the ninety-day cure period. Defendant explains that the emergency "severely impeded the movement of trains west of the Mississippi River for a sustained period of time from the Summer of 1997 through the Spring of 1998." Defendant refers the court to several STB press releases, each of which describe, in vivid detail, the gravity of the situation. To further illustrate the epidemic proportions of the transportation crisis, defendant also quotes significant portions of Emergency Order No. 1518.

In response, plaintiff maintains, KCS' ability to equalize its horsepower hours deficit was not, in fact, impracticable, impossible, or otherwise frustrated.[2] Rather,

---

1. Established in 1996 by the ICC Termination Act of 1995, 49 U.S.C. § 10101 *et seq.*, the Surface Transportation Board is an independent, adjudicatory body within the Department of Transportation that asserts broad regulatory authority over railroads. Pursuant to 49 U.S.C. § 11123:

When the Board determines that shortage of equipment, congestion of traffic, unauthorized cessation of operations, or other failure of traffic movement exists which creates an emergency situation of such magnitude as to have substantial adverse effects on shippers, or on rail service in a region of the United States, or that a rail carrier providing transportation subject to the jurisdiction of the Board under this part cannot transport the traffic offered to it in a manner that properly serves the public, the Board may, to promote commerce and service to the public, for a period not to exceed 30 days—

(1) direct the handling, routing, and movement of the traffic of a rail carrier and its distribution over its own or other railroad lines;
(2) require joint or common use of railroad facilities;
(3) prescribe temporary through routes; or
(4) give directions for—
  (A) preference or priority in transportation;
  (B) embargoes; or
  (C) movement of traffic under permits.
49 U.S.C. § 11123 (1997).

2. The court notes that plaintiff's initial argument is that the availability of the doctrines of commercial frustration and impracticability of performance is foreclosed by the language of the contract. As evidenced by the contract's use of the term "inability," plaintiff contends, the parties specifically contemplated that, at some point, one party would be unable to eliminate its deficit within the ninety-day period. Because the court finds that defendant's claims of commercial frustration and impracticability fail on the merits, the

plaintiff contends, defendant simply chose not to use its locomotives to reduce the balance of hours owed to BNSF by instead electing to use its locomotives to profit by servicing other customers. To support its theory that KCS' ability to equalize its horsepower hours deficit was not impeded in any manner by the transportation crisis, plaintiff refers the court to the depositions of defendant's agents, in which defendant's employees admit that instead of using its locomotives to equalize its horsepower hours balance, KCS was dispatching its locomotives elsewhere to capitalize upon the situation created by the transportation emergency.

■ The court concludes that summary judgment on defendant's defenses to its delayed performance, whether temporally-delineated as permanent or temporary, and whether legally characterized as commercial frustration, legal impossibility, or impracticability of performance, is proper. While it is clear to the court that the shortage of locomotives and resulting chaos within the railway system extensively affected railroad companies during the latter part of 1997 and beginning months of 1998, defendant has failed to establish how the widespread transportation emergency prevented it from executing its duties under the contract. Defendant's purported evidence of impracticability does nothing more than demonstrate the severity of the transportation problem during those months; it does not, however, support its impracticability claim. Indeed, although defendant repeatedly cites to Emergency Order No. 1518, a careful review of that order reveals that KCS was never specifically ordered to assist in alleviating the emergency. In fact, while the order imposes certain obligations upon Texas Mexican Railway, Union Pacific Railroad Company/Southern Pacific Transportation Corporation, and plaintiff BNSF, defendant's name is conspicuously absent from the list of entities ordered to carry out the proposed remedial efforts. Although the court does not address the substance of this argument.

though the court fully appreciates that, as suggested by defendant's agent, the STB may have in fact requested, or even begged for, assistance from other railway companies, or that the consequences of defendant's failure to lend its locomotives to other companies might have worsened the crisis, defendant has presented insufficient evidence to establish that a genuine issue of material fact remains with respect to its affirmative defense of impracticability. Indeed, although the imposition of a government order may excuse non-performance under certain circumstances, there is no evidence that such circumstances existed here. The STB did not order KCS to divert its locomotives or to service other railway customers. Furthermore, defendant has presented no evidence to suggest that its locomotives were somehow "stuck" in a faraway place, or otherwise undispatchable to the BNSF/KCS interchange, as a result of the transportation crisis. At best, defendant may have subjectively perceived that the servicing of other customers was mandatory in the light of the massive locomotive shortage then occurring within the industry. The more likely explanation, however, is that KCS merely exercised its discretion to use its locomotives in a manner that breached the terms of the agreement between KCS and BNSF, and for that breach, defendant is liable.

■ Similarly, the court finds plaintiff entitled to summary judgment on defendant's claim of commercial frustration. Far from establishing the existence of a material fact issue with respect to this defense, defendant has failed to provide sufficient evidence to substantiate even the prima facie elements of such a claim. As stated earlier, the purpose of the doctrine of commercial frustration is to excuse parties from performance where the value of the underlying contract would be otherwise obliterated due to the occurrence of an unforeseen supervening event. In this

case, however, defendant has presented no evidence to indicate that the transportation emergency diminished, much less completely negated, the expected benefits of the horsepower hour equalization contract between BNSF and KCS. On the contrary, KCS took full advantage of the parties' contract during the transportation crisis: the parties' contract allowed KCS access to BNSF's locomotives at the Kansas City interchange during the emergency months so that KCS could use its own locomotives elsewhere to service other customers. Rather than the expected benefit of the contract, i.e., the use of another railway company's locomotives, being "frustrated" by the transportation crisis, KCS was able to profit from the parties' contract during that time. Thus, in the absence of any evidence to establish that the purpose of the parties' contract was frustrated by the transportation emergency, the court concludes that defendant has failed to carry its burden on summary judgment with respect to the commercial frustration defense.

In sum, whatever the reason for defendant's failure to equalize the deficit incurred as of November 5, 1997, defendant has simply offered insufficient evidence to sustain its burden to establish that a genuine fact issue remains as to the applicability of the defenses of impossibility, impracticability or commercial frustration to excuse its breach of the contract. Accordingly, summary judgment as to defendant's affirmative defenses of legal impossibility, impracticability of performance and commercial frustration is appropriate.

### C. Time Is *Not* of the Essence Defense

■ The court concludes that plaintiff is entitled to summary judgment with respect to defendant's assertion of what amounts to a "time is *not* of the essence" defense as well. Under Missouri law, "[i]f a contract specifies a certain time for performance, the contract must be performed at that time, even if time is specified by the hour." *Miceli v. Dierberg*, 773 S.W.2d 154, 156 (Mo.Ct.App.1989) (citation omitted). With respect to provisions indicating that time is of the essence, the *Miceli* court noted, "[c]ustom will not alter express agreement of the parties." *Id.*

Relying on general equity principles, defendant argues that, unless the circumstances so dictate or the parties otherwise agree, the time of performance is not "of the essence" such that reasonable delays in an obligor's performance rarely constitute a material breach. 17A AM.JUR.2D *Contracts* § 483 (1991). The court notes that the recent trend appears to expand this presumption beyond equity actions, such that "it has been stated that the tendency of judicial authority at law as well as in equity is to regard the question as one of construction to be determined by the intent of the parties. . . ." *Id.* On the basis of this modern trend treating time as non-essential to performance, defendant argues that time was not of the essence under the parties' contract, and thus that its six month delay in equalizing its horsepower hours deficit does not rise to the level of a breach of the parties' agreement.

To support its contention that, with respect to the equalization of horsepower hours, time was not of the essence, defendant refers the court to deposition testimony indicating that demands for cash payment for unequalized horsepower hours is "rare" in the industry. Defendant further explains that the nature of locomotive sharing agreements practically guarantees that railway companies operating thereunder will face an almost constant deficit situation. Defendant also maintains that, despite the numerous occasions on which KCS has owed horsepower hours to BNSF, BNSF has never before elected the cash payment option during the parties' course of dealing. Defendant essentially argues that because the cash demand option for horsepower hours owed is rarely invoked by parties to horsepower hours sharing agreements, and because BNSF has not previously invoked the cash payment option, performance within the three-

month cure period was less than "of the essence."

■ The court disagrees with KCS' argument that performance within the ninety day period was not crucial to the parties' agreement. Instead, the court finds that the contract clearly and unambiguously imposes a specific time period in which an owing party may equalize its deficit. Specifically, the contract's express terms provide that at the end of the ninety-day cure period, one of two options may be exercised by the party to whom hours are owed: 1) the time in which to equalize the deficit may be extended, or 2) a cash payment for the remaining balance may be demanded.

In light of the explicit time limitation set forth in the contract, as well as Missouri law relating to the subject of specifications for time of performance, the court cannot rule that the importance of an owing party's timely performance was left unconsidered by the parties. On the contrary, rather than allowing the duty to equalize a deficit to be performed at the owing party's leisure, the contract expressly imposed a ninety-day time limit. Moreover, the parties envisioned the consequences of a failure to abide by the ninety-day cure period by explicitly providing the owed party the option to demand cash payment in lieu of extending the ninety-day cure period. Accordingly, the court concludes that defendant has failed to provide sufficient evidence to establish that a material fact issue remains with respect to defendant's time is not of the essence defense.

### D. "Remaining Unequalized Horsepower Hours"

The undisputed facts reveal that in the three months following its demand upon KCS to cure its outstanding balance, KCS did not reduce its horsepower hours deficit, but instead tripled it, such that the number of hours owed BNSF at the end of the ninety-day cure period totaled 135,-854,985. Plaintiff maintains that, pursuant to its option to demand cash payment for

any balance remaining at the end of the cure period, plaintiff was entitled to cash payment for the entire deficit then outstanding as of January 31, 1998, rather than the outstanding balance of 43,459,275 hours for which it issued notice on November 5, 1997.

Defendant does not deny that rather than reducing its deficit during the ninety days following BNSF's issue of notice, it substantially increased the amount of hours for which it was indebted to BNSF. Defendant takes issue, however, with plaintiff's interpretation of its options under the contract as including the right to demand payment for the entire balance owed three months after BNSF's notice. Instead, defendant argues, if plaintiff is entitled to cash payment for any horsepower hours, the amount of recovery is limited to the original deficit of 43,459,275 hours, the number of hours owed at the time BNSF submitted its notice.

According to defendant, to be entitled to recover cash payment for the additional hours logged between the notice's issuance and the date of the cash demand would require plaintiff to first provide KCS an additional three months to equalize the additional 92,395,710 deficit. Furthermore, on the basis of what appears to be a waiver theory, defendant submits that because BNSF demanded payment for the entire 135,854,985 hours, BNSF's option to demand cash payment was never properly invoked. Consequently, defendant explains, by accepting KCS' eventual equalization of the deficit, BNSF "effectively exercised its option to allow equalization of horsepower hours over a longer period of time."

■ Under Missouri law, "the construction of a contract is ordinarily a matter of law." *MECO Sys., Inc. v. Dancing Bear Entertainment, Inc.*, 948 S.W.2d 185, 190 (Mo.Ct.App.1997). "However, summary judgment is appropriate in contract cases only when the meaning of the portion of the contract in issue is so apparent

that it may be determined from the four corners of the document." *Id.* Thus, if a contract is clear and unambiguous, it is proper for the court to interpret its terms as a matter of law.

■ The court agrees with defendant's argument that the option of "receiving payment for any remaining unequalized horsepower hours" limits any demand for cash payment to the number of hours remaining from the balance existing at the time that the notice to equalize was issued. A contrary construction of the contract makes little sense. Indeed, it is clear from the language of the contract that the cash payment demand could be made only after the ninety day period elapsed. Thus, a plain reading of the contract indicates that the notice effectively provides the owing party an opportunity to cure its deficit before a monetary charge for those hours is imposed. Accordingly, the court concludes that the number of hours for which plaintiff is entitled to collect cash payment is limited to the original balance for which the notice was issued, or 43,459,275 hours.

■ With respect to defendant's "waiver" theory, the court has been unable to find, and defendant fails to cite, any authority to support the proposition that an error in the calculation of amount owed, or even the act of making an unreasonably high demand for a particular service, justifies a finding that the mathematically-challenged party has waived its underlying contractual rights. Missouri law defines waiver as

> an intentional relinquishment of a known right, on the question of which intention of the party charged with waiver is controlling and, if not shown by express declarations but implied by conduct, there must be a clear, unequivocal, and

decisive act of party showing such purpose, and so consistent with intention to waive that no other reasonable explanation is possible.

*Carroll's Warehouse Paint Stores, Inc. v. Rainbow Paint & Coatings, Inc.,* 824 S.W.2d 147, 151–52 (Mo.Ct.App.1992) (quoting *Bartleman v. Humphrey,* 441 S.W.2d 335, 343 (Mo.1969)). Plaintiff's action of demanding payment in an amount with which defendant disagrees surely does not constitute an intentional waiver to its right to cash payment for the hours owed as of the November 5, 1997 notice. The court thus concludes that BNSF's demand for cash payment equivalent to 135,-854,985 horsepower hours, while in error, does not foreclose its right to collect cash payment for the balance remaining ninety days after the November 5, 1997 notice.

### E. Number of Horsepower Hours Owed

Plaintiff moves for summary judgment as to its claim for what plaintiff deems the outstanding balance remaining as of its January 31, 1998 demand for cash payment. Plaintiff argues that it rightfully exercised its contractual right to demand cash payment for the balance remaining ninety days after it issued the November 5, 1997 notice to KCS to equalize its horsepower hours deficit. Defendant's failure to honor BNSF's cash demand, plaintiff maintains, constituted a breach of the parties' contract for which defendant is liable.

Although the court disagrees with the number of hours plaintiff argues it is entitled to collect the cash equivalent of, the court finds summary judgment in favor of plaintiff appropriate.[3] As stated in the previous section, the court interprets the parties' agreement as requiring defendant to compensate plaintiff for the cash value

---

3. The court notes that plaintiff has also asserted a claim for specific performance. This claim is essentially identical to plaintiff's claim for contract damages, in that plaintiff merely seeks to require KCS to abide by the contract's language requiring an owing party to tender the cash equivalent of its deficit remaining ninety days after a deficit notice if the party to whom the deficit is owed invokes the cash payment option. Thus, plaintiff's remedy at law is adequate and there is no basis for the court to order specific performance. *See Homar Enters., Inc. v. Daake,* 957 S.W.2d 353, 357 (Mo.Ct.App.1997).

of 43,459,275 horsepower hours, the amount of defendant's deficit remaining ninety days after the November 5, 1997 notice.

## F. Applicable Rate

The parties' contract provides that, in the event that a cash demand is made, the monetary value of the unequalized horsepower hours is determined by the rates calculated "for the latest calendar year for which annual figures are available." The parties disagree as to the applicable rate; defendant contends that the appropriate rate is 1997's rate of $0.0116 per horsepower hour, while plaintiff maintains that the applicable rate is 1996's rate of $0.0173.

■■■ To support its argument that the 1997 rate was available when BNSF demanded payment, defendant refers the court to a letter dated December 3, 1998 from David Stropes, an agent of BNSF, to Mark Davidson, an agent of KCS, in which Stropes "agree[s] with the calculated values of $0.0173 per horsepower hour for 1996 and $0.016 per horsepower hour for 1997." To that letter, labeled as Exhibit E to defendant's memorandum in opposition to plaintiff's motion for summary judgment, is attached a number of documents pertaining to 1996 and 1997 horsepower hour rates. The document referring to the 1996 year fixes the horsepower hour rate at $0.0173, and states that it is "[b]ased on The 1996 Annual Report filed March 31, 1997." The document labeled "1997" fixes the horsepower hour rate at $0.0116, and states that it is "based on The 1997 Annual Report filed March 31, 1998." Plaintiff argues that because plaintiff's cash demand was made on January 31, 1998, the data pertaining to 1997 was not yet available, as indicated by the March 31, 1998 date of the report upon which it purports to be based. Defendant has not addressed the issue in any of its subsequent papers.

The court finds that defendant has failed to offer sufficient evidence to establish the existence of a genuine issue of material fact with respect to the rate available as of BNSF's January 31, 1998 cash demand. Indeed, the evidence provided by defendant appears to contradict, rather than support, its assertion that the 1997 rate data was available as of the January 31, 1998 payment demand. Accordingly, the court concludes that plaintiff is correct in its assertion that the 1996 rate, or $0.0173, rather than the 1997 rate of $0.0116, is the rate per horsepower hour to which BNSF is entitled.

Applying the $0.0173 rate to calculate the amount owed by defendant for its uncured balance of 43,459,275 horsepower hours remaining as of the January 31, 1998 demand, the court concludes that plaintiff BNSF is entitled to damages in the amount of $751,845.46.

## G. Defendant's Counterclaim

The uncontroverted facts reveal that defendant's horsepower hours deficit peaked at 135,854,985 on January 31, 1998. Since that time, defendant steadily reduced its deficit, and eventually eliminated it in July 1998, six months after BNSF's cash demand.

By its counterclaim, defendant claims that "[i]f plaintiff is entitled to receive any sum for the horsepower hours deficit owed by defendant to plaintiff during the period September 1997 through February 1998, defendant is entitled to recover from plaintiff a like amount for the horsepower hours deficit owed by plaintiff to defendant during the period March 1998 through July 1998." Plaintiff moves for summary judgment with respect to defendant's counterclaim.

For the same reason that the court deems BNSF ineligible for cash payment for any hours exceeding the original 43,-459,275 deficit for which the November 5, 1997 notice was issued, the court concludes that summary judgment on defendant's counterclaim in favor of plaintiff is appropriate. The court interprets the parties' contract as requiring an issuance of notice

prior to any cash demand for unequalized horsepower hours. Because defendant has failed to issue any such notice, an award of the cash equivalent of any horsepower hours owed by BNSF to KCS between March 1998 and July 1998 is improper under the contract. Accordingly, plaintiff is entitled to judgment as a matter of law on defendant's counterclaim.

## IV. Conclusion

By this decision, it appears to the court that all issues suitable for trial are resolved. Consequently, the matter has been removed from the court's April 1999 trial calendar. The court notes, however, issues concerning prejudgment interest were not addressed by either party in their respective papers. An award of prejudgment interest in this case presents a choice of law issue, as well as questions relating to the amount due, if any, under the law governing plaintiff's entitlement to prejudgment interest. Accordingly, plaintiff BNSF is directed to file and serve on opposing counsel, by hand delivery or by facsimile, its brief on the issue of prejudgment interest on or before March 12, 1999. Defendant KCS is directed to file and serve on opposing counsel, by hand delivery or by facsimile, any response thereto on or before March 19, 1999.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 44) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's motion for summary judgment (doc. 46) is granted in part and denied in part. Plaintiff is entitled to judgment in the amount of $751,845.46.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff shall file and serve on opposing counsel, by hand delivery or by facsimile, its brief on the issue of prejudgment interest on or before March 12, 1999. Defendant KCS shall file and serve on opposing counsel, by hand delivery or by facsimile, any response thereto on or before March 19, 1999.